# THOMAS F. RYAN *vs.* LOUIS McLANE ET AL.

*Agreement for Sale of Controlling Interest in Shares of Stock of a Railway Company—Construction of Contract with Reference to a Pooling Agreement—Specific Performance—Mutuality of Obligation—Demurrer.*

A bill in equity to enforce specific performance of an agreement, relating to the sale of shares of stock, set forth the agreement itself and the construction placed on it by the plaintiff    *Held*, that a demurrer to the bill does not admit the correctness of plaintiff's construction of the contract.

*Semble*, that a contract for the sale of shares of stock for the purpose of enabling the buyer to control a *quasi* public corporation like a railway company will not be specifically enforced by a Court of Equity.

Defendants were holders of a large number of shares of stock in a railway company, and were also a committee representing other stockholders. Plaintiff, another stockholder, representing also undisclosed associates, was desirous of purchasing a controlling interest in the corporation. On October 6th, 1896, an agreement was signed by plaintiff and defendants which set forth that defendants "in behalf of themselves and associate stockholders are desirous of making a sale of all their stock and also the shares of all such other stockholders as join with them prior to October 18th." And that the plaintiff "is willing and desirous to purchase all the shares of stock held by said committee as the same may be pooled and deposited prior to said October 18th." The agreement then provided for the price to be paid "for all such pooled stock" and that "the committee is to declare the amount of all stock deposited with said pool and embraced in this contract of sale on October 18th." Plaintiff deposited with the committee $60,000 and agreed that "that sum should be forfeited and paid as liquidated damages in case he and his associates failed at the expiration of forty days to accept, take over and fully pay in cash for all such pooled stock." Plaintiff filed a bill for the specific performance of this contract, alleging that defendants represented to him that the stock in the corporation owned by themselves and others for whom they were authorized to act amounted to 3,000 shares, and that they reserved the right to include in the sale all shares of stock that might be deposited with them prior to October 18th. The bill further alleged that the refusal of the defendants to deliver the stock "was based upon the terms of the contract or pooling agreement between themselves and other

stockholders dated October 2nd, 1896, under which said stock had been deposited with them, which contained a provision that no sale should be made without the concurrence of the holders of three-fourths of the stock held by all the signers of the pooling agreement without reference to the question whether it had actually been deposited or not prior to the date mentioned." This pooling agreement was alleged by the plaintiff to be void as against public policy. It was set forth in one of the exhibits of the bill. Upon demurrer, *held*,

1st. That the contract sued on was made by both parties with reference to the pooling agreement between the stockholders, and that the plaintiff knew that the purpose of the defendants was to sell all the shares of those stockholders who might join the pool before October 18th, as well as those who had joined on October 6th, all of said stock being the subject of the negotiations and not merely, as alleged by the plaintiff, the shares that had been pooled and deposited prior to October 18th.

2nd. That so construed with reference to the pooling agreement, the alleged contract between plaintiff and defendants was merely an offer or option, and that no sale could be made without the ratification by the holders of three-fourths of the stock pooled before October 18th.

3rd. That since the plaintiff was not bound under the agreement to take and pay for the stock held by the defendants, but would be released by the forfeiture of the $60,000 deposited, the agreement is not one to be specifically enforced, because lacking in mutuality.

4th. That whether the pooling agreement be valid or not is immaterial, because the alleged contract of sale sued on being made with reference to the pooling agreement it would be inequitable to enforce the former if the latter be void, and if the pooling agreement be valid, then the contract with the plaintiff, not having been ratified by the holders of three-fourths of the pooled stock, never became effective.

Appeal from the decree of the Circuit Court of Baltimore City (WICKES and STOCKBRIDGE, JJ.) The pooling agreement referred to in the opinion of the Court was as follows:

" This agreement, made and entered into this second day of October, 1896, witnesseth as follows, to wit : That we, the undersigned, owners and holders of stock of the Seaboard and Roanoke Railroad Company, to the amounts set opposite our respective names, for our mutual protection, hereby covenant and agree each with the other, for the period of five years from the date of this agreement or until

thirty days after its abrogation by the written assent of the parties hereto, owning and holding at least three-fourths of the aggregate amount of said stock, will not, without the written consent of the owners or holders of three-fourths of the aggregate amount of shares held by the parties hereto, sell or otherwise dispose of our holdings of said stock, or any part thereof, or delegate to any person or persons not a party hereto any of the voting power thereof; it being the true meaning and intent of the parties hereto to pool, during the continuance of this agreement, their respective interests in the shares of stock, and to make no sale or other disposition of such stock, or delegate their respective voting powers except such delegations as that hereinafter provided, and except such sale shall be agreed to by the parties hereto owning and holding at least three-fourths of the aggregate amount of said shares; and for the purpose aforesaid, and to facilitate the carrying out of the intent and meaning of this agreement, it is further covenanted and agreed that Louis McLane, of Baltimore; Moncure Robinson, of Philadelphia, and Legh R. Watts, of Portsmouth, Va., are hereby appointed a committee to represent the pool hereby created and formed, to manage and control the said shares of stock and the voting power thereof to the extent that said committee or any member or members thereof, who may be present at any meeting of stockholders of the Seaboard and Roanoke Railroad Company, shall have the right to vote at such meeting, the shares of stock held by the respective parties hereto, who may be absent from such meeting.

" It is further understood and agreed, that all the rights conferred and obligations entered into by this agreement, shall be enjoyed by and be binding upon the personal representatives of the parties hereto.

" In witness whereof, we have hereunto set our names and the number of shares of stock respectively held by us and the number of the certificates representing the same, the day and year aforesaid."

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Bernard Carter* and *William L. Marbury*, for the appellant.

*William A. Fisher*, *John Prentiss Poe* and *J. Southgate Lemmon*, for the appellees.

FOWLER, J., delivered the opinion of the Court.

The bill in this case was filed by Thomas F. Ryan, of New York, against Louis McLane and others for the specific performance of an alleged contract and for an injunction to restrain the defendants from parting with, transferring or encumbering the possession of any certificates of stock held by them respectively of the Seaboard Company, a railroad company incorporated and existing under the laws of Virginia and North Carolina. Under powers granted by its charter this company operates not only its own line extending from Portsmouth, Virginia, to Weldon, North Carolina, with several branches connected therewith, but it also controls and operates eight other lines of railroad, the names and lengths and termini of which it is not necessary now to mention, but the bill alleges that by means of the ownership of its own chartered line, and the control of the other corporations just referred to, the Seaboard Company practically owns, controls and operates a railroad nearly a thousand miles in length, extending from Norfolk to Atlanta, the total capital stock of which aggregate $6,142,550, and the total bonded debts and rental charges amount to about $16,712,000; while the gross earnings of the whole system for the fiscal year ending June 30th, 1898, were officially reported to be $4,011,554.32.

In the sixth paragraph of the bill it is alleged that on October 6th, 1896, the plaintiff was a stockholder of the Seaboard Company, and had, as was well known to the defendants, entered into contracts to purchase a large amount of such stock; that on the day just mentioned he entered

into negotiations with three of the defendants, McLane, Robinson and Watts, for the purchase of a large amount of the shares of stock of the Seaboard Company from the defendants just named, they then and there representing that they were personal stockholders in said company, and also as a committee representing a large amount of stock in said corporation held by others ; that the three defendants represented to the plaintiff that the stock in the Seaboard Company owned by themselves and the associated stockholders, for whom they were authorized to act, amounted to upwards of 3,000 shares of the par value of $100 each, and that they were desirous of making a sale of all such stock in said corporation, reserving also the right to include in such contract a sale of the shares of any stockholders of said Seaboard Company as should join with them and deposit their stock with said McLane, Robinson and Watts prior to October 18th, 1896. It was at the same time agreed, between the plaintiff and the defendants just mentioned, that the plaintiff was to pay $125 per share for all the said stock owned by said defendants, as well as for that owned by the stockholders, who were then represented by said defendants, and also for the stock of other stockholders of said company, " who should agree to such contract of sale and deposit their stock for delivery to the plaintiff on or before October 18th, 1896. " It was further agreed as alleged that the plaintiff " should then and there pay the sum of $60,000 earnest money upon such purchase of stock, the same to be forfeited as liquidated damages if the plaintiff should fail to receive, take and pay for all the stock of the Seaboard Company in such contract of sale. " It is alleged in the following paragraph—the seventh—that on the same day on which the above verbal agreement was made, the plaintiff and said McLane, Robinson and Watts, in order to evidence such agreement and contract, entered into a written agreement, a copy of which is filed with and made part of the bill. Inasmuch as the whole object of this litigation appears to be to compel a specific performance of

this written contract we will have to examine it carefully and for that purpose we will here transcribe it.

" Memorandum of understanding and agreement between Louis McLane, Moncure Robinson and Legh R. Watts, committee, parties of the first part, and Thomas F. Ryan, in behalf of himself and associates, party of the second part.

" Whereas, the parties of the first part are stockholders in the Seaboard and Roanoke Railroad Company, and also represent a large amount of stock in said corporation held by others :

"And, Whereas, the said committee, in behalf of themselves and associate stockholders, are desirous of making a sale of all their stock in said corporation, and also the shares of all such other stockholders as join with them prior to October 18th, 1896 ;

"And, Whereas, the party of the second part, in behalf of himself and associates, is willing and desirous to purchase all the shares of stock held by said committee as the same may be pooled and deposited prior to said October 18th, 1896, on the terms and conditions and for the price hereinafter stated.

" Therefore, to carry out such intended purchase of said stock the parties agree together as follows :

"*First.*—The price which is to be paid for all such pool stock of the Seaboard and Roanoke Railroad Company is one hundred and twenty-five dollars per share.

"*Second.*—The committee is to declare the amount of all stock deposited with the said pool and embraced in this contract of sale on October 18th, 1896.

"*Third.*—The party of the second part makes this contract to purchase relying on the representation that the railroad companies comprising the Seaboard Air Line system are free of all floating debt due to any creditor other than some company in that system. Said party of the second part is to have forty days from this date within which to have an examination made into the condition and accounts of said corporation and system and to determine whether said representation is correct.

"*Fourth.*—The party of the second part now deposits sixty thousand dollars cash with the committee, and agrees that that sum shall be forfeited and paid as liquidated damages in case he and his associates fail, at the expiration of said forty days, to accept, take over, and fully pay in cash for all such pool stock, at the price of one hundred and twenty-five dollars for each and every share thereof. If such liquidated damages are so forfeited by the second party, said sum shall be paid over by the said committee to the railroad company and distributed as a dividend among all the holders of common stock. At the expiration of said forty days the party of the second part agrees to purchase and take over from such committee not to exceed one hundred and seventy-five shares of the stock of the Baltimore Steam Packet Company and to pay therefor the sum of fifteen hundred dollars cash for each share.

"*Fifth.*—Simultaneously with the closing of said option by the party of the second part, and the payment in cash for all such pool stock of the Seaboard and Roanoke Railroad Company, less the sixty thousand dollars deposited with the execution of this contract, which is to be treated in that event as a part of the purchase money. And also to pay in cash for the shares of the Baltimore Steam Packet Company above specified. The committee are to provide, if requested by the second party, the resignation of the president and directors of the Seaboard and Roanoke Railroad Company and of their controlled corporations and the Baltimore Steam Packet Company and procure the nominees of the party of the second part to be elected in their places, so as to give control of said corporation to said second party.

" Witness the following signatures and seals to this memorandum of agreement, which is executed in triplicate this sixth day of October, A. D. eighteen hundred and ninety-six.

Louis McLane,

Moncure Robinson,

Legh R. Watts,

Thomas F. Ryan."

Subsequent to the filing of the bill the plaintiff filed several exhibits in addition to the above agreement, consisting of records of two suits in equity, both brought by him, one in the Circuit Court of the United States for the District of Maryland on the 11th of May, 1897, against McLane, Watts, and the executors of Robinson, and the other in the Circuit Court for the Eastern District of Virginia on 2nd of October, 1897, against the Seaboard and Roanoke R. R. Co. and others. We shall have occasion to refer to some of these exhibits presently.

In the seventh paragraph of the bill the plaintiff further alleges, that in part performance of said written agreement, he paid to the said committee $60,000 in cash as part of the purchase money for said said stock, and that under said written agreement, as construed by him, he agreed and bound himself to purchase, accept and pay $125 per share for all the shares of stock held by others than the said committee and their associates who should, prior to October 18th, 1896, join in said contract of sale on the terms and conditions therein stated, and should deposit their stock with said committee, and that the latter thereby bound themselves to declare on October 18th, 1896, the amount of all stock deposited with them and embraced in such contract of sale. It is further alleged that said committee represented that the shares of stock owned by them and those then associated and represented by them in said contract amounted to over 3,000 shares, but that they refused to give any information as to the amount of stock held by them and their associates respectively; that said committee did not inform the plaintiff that any stockholders of said company not associated with them prior to October 6th, 1896, had elected to join with said committee in the said contract of sale or to deposit their stock before October 18th, 1896, and the plaintiff, therefore, avers that said committee had not prior to that date received any deposit of stock which he was bound to take, except the stock of said committee owned and held by them individually, and the stock of

those actually associated with them on October 6th, 1896; it is also alleged that the certificates of the stock the plaintiff was bound to take had been deposited with the defendant McLane and were in his possession in Baltimore, Md. at the time of filing of the bill; that the plaintiff has offered to take and pay for all the stock covered by said contract, but that said committee refused to deliver the same.

In the fourteenth paragraph of the bill, it is alleged that the refusal of the committee to deliver the stock claimed by the plaintiff was based upon the terms of the contract or pooling agreement between themselves and other stockholders, dated October 2nd, 1896, under which said stock had been deposited with them, which contained a provision that no sale should be made without the concurrence of the holders of three-fourths of the stock held by all the signers of the pooling agreement, without reference to the question as to whether it had actually been deposited or not prior to the date mentioned. By the terms of the pooling agreement just referred to, dated the 2nd October, 1896—four days before the execution of the contract here sought to be enforced—it was for their mutual protection agreed between the stockholders of said company who should sign it, that for the period of five years from the date of said agreement, or until thirty days after it was abrogated by the written assent of the parties thereto holding three-fourths of the said stock, none of said stock should be sold or transferred for voting purposes unless with the written concurrence of the same number of such stockholders as were authorized to abrogate said agreement. The plaintiff further alleges, that being advised that the pooling agreement was void as against public policy and for other reasons, he instituted suits in the Circuit Courts of the United States for the District of Maryland and the Eastern District of Virginia to have said agreement set aside so that the defendants might be without excuse for their refusal to carry out their contract of sale.

But a few days before the hearing in the Court below the plaintiff amended his bill by adding several additional paragraphs, the most important of which and the one most relied upon by the plaintiff, is paragraph xivA. We shall have occasion to refer to this amendment more particularly hereafter. It is sufficient to say that the pooling agreement, so far as is disclosed by the bill in this case, has never been set aside either by the concurrence of the parties thereto or by the decree of any Court.

We have thus stated so much of the very elaborate bill as we think is necessary to a discussion of the controlling questions presented by this appeal.

The defendants demurred to the whole bill as amended upon the grounds : (1) that it is without equity ; (2) that the Court is without jurisdiction to grant the relief prayed. The Court below passed a decree sustaining the demurrer, dismissing the bill and dissolving the injunction. From this decree the plaintiff has appealed.

Although the discussion at the hearing took a wide range, and the arguments of the distinguished counsel for both plaintiff and defendants were characterized, if possible, by more than their usual ability and research, yet, after all, the plaintiff's case must rest upon the contract alleged to have been made by him with the defendants. A good deal was said as to the effect of the demurrer in this case, that is to say, how far and in what sense it admits the allegations of the bill. It is sufficient to say that the demurrer does not admit the construction the plaintiff has, in his bill, placed upon the alleged contract of sale to be correct, nor the correctness of the construction he has placed upon the pooling agreement, on which the defendants rely to justify their refusal to consummate the agreement relied on by the plaintiff. In other words, the demurrer admits that there were such contracts as are set out in the exhibits, and raises the question as to their true construction. It follows, therefore, that our principal duty in this case, waiving the question of jurisdiction, will be to ascertain what is the true

meaning of the contract of October 2nd, 1896, in the light of the traversable averments of fact not contradicted or shown to be untrue in one or other of the exhibits filed by the plaintiff.

But before considering this controlling question it may be proper to pause for a moment to enquire more particularly as to what is the case presented to us by this bill. It is simply this. The plaintiff comes into a Court of Equity asking for the specific performance of a contract which upon its face shows that, so far as the parties to it were concerned, it was entered into for the purpose of enabling him to get control of this great corporation. He was to become the owner of stock, according to his construction, of just enough stock to make him master of the situation, so that upon *his request* those who had been placed in authority by the stockholders were to resign and place him in control not only of the Seaboard Air Line, but of the eight other corporations connected with and operated by it. But whatever may be the construction of this contract by the plaintiff, it also appears upon its face that the intention of the committee was to make terms in relation to, and were desirous of making a sale of, not only their own stock but as well that of their associates and the stock of *all* such other stockholders as should join with them prior to October 18th, 1896. We say this is apparent from the contract itself. Such a course was, without regard to the pooling agreement, demanded by the plainest dictates of ordinary fair dealing. In short, the course which the plaintiff is here contending the defendants are bound to pursue, would have resulted in selling their own stock, and at the same time in selling out the minority stockholders. While we do not wish to be understood as saying that never, under any circumstances, will a Court of Equity enforce a contract for the purchase of a controlling interest in a corporation, yet we are clearly of opinion that this contract, showing as it does upon its face, an evident intention on the part of the Committee to protect *all* the stockholders who should join in the pool before

October 18th, 1896, should not be enforced by a Court of Equity in such manner as to prevent the carrying out of that intention. It may be that the position of the plaintiff in this respect may be legal, but it is certainly far from equitable. He relies upon the provision in the contract that he was to take and pay for only such shares of stock as were both pooled and *deposited before 18th October, 1896*, while he must have known from the face of the contract itself, that the object of the committee was to sell, not only their own stock, and the stock of those who had joined the pool on October 6th, but also all the stock of other stockholders who should join before the 18th of that month. This is shown, as we have said, not only by the contract itself, but also by the circular letter signed by R. C. Hoffman, dated October 7th, 1896, the day after the execution of the alleged contract of sale. This letter, or a copy of it, was filed by the plaintiff with his bill in the Circuit Court of the Eastern District of Virginia, and that bill alleges that it was sent to all the stockholders of The Seaboard Company, of whom he was one. It informs them and informed him that the pool is for the benefit of *all*, and requests them all to join on or before the 18th October. It is sufficient for the purposes of the aspect of the case we are now discussing that, whatever may have been the plaintiff's views in regard to his legal rights, he was fully informed, and must be held to have known from the very beginning, of negotiations at Norfolk, of the equitable ground upon which the defendants were standing. Although it may not be proper to take, as admitted by the demurrer, the allegations of the sworn answers of Messrs. McLane and Watts to the bill filed by the plaintiff in the United States Circuit Court for the District of Maryland, and filed as exhibits with the bill in this case, yet we can not shut our eyes to the facts therein alleged, namely, that before and at the time the alleged contract of sale was made the plaintiff and his attorney were in possession of full knowledge that the Committee was acting for all the stockholders who should join the pool before October

18th, and not, as he now contends, for only those who had joined *and deposited their stock* before that date. What must be the answer of a Court of Equity to a plaintiff who asks it to exercise its sound judicial discretion in the specific performance of a contract which has for its main object the placing of this great corporation in his control or in the control of himself and his undisclosed associates? It seems very clear to us that it is no part of the duty of such a Court to grant any relief under such circumstances as confront us under the allegations of this bill and the exhibits filed with it. The only case, so far as we have been informed, where a plaintiff has appealed to a Court of Equity to specifically enforce a contract for the purchase of stock for the purpose of getting control of a corporation is the case of *Foll's appeal,* 91 Pa. St. 436. The bill in the case just referred to was filed to compel the specific performance of a contract for the sale and delivery of stock of a national bank for the purpose of controlling it. We quote from the opinion just cited : " This case presents some extraordinary features. We have nothing like it in this State since equity powers were conferred upon the Courts. * * * The avowed object of the purchase of the stock and the filing of this bill was to get control of the bank for Greer and his friends. This appears upon the face of the bill and is the main ground upon which equitable relief is asked. * * * While the legal right of the plaintiff to buy up sufficient of the stock of this bank to control it, in the interest of himself and friends, may be conceded, it is by no means clear that a Court of Equity will lend its aid to help him. A national bank is a *quasi* public institution. While it is the property of its stockholders and its profits enure to their benefit, it is nevertheless intended by the law creating it that it should be for the public accommodation. * * * The stock, as now held, is scattered among a variety of people and held in greater or lesser amounts. It is difficult to see how the small stockholders, who have their modest earnings invested in it; the depositors, who use it for the safe keeping

of their money, or the business public, who look to it for accommodation, * * are to be benefited by the concentration of a majority of its stock in the hands of one man, or in such way that one man and his friends can control it. * * * Were we to affirm this decree I see no reason why we may not be called upon to use the extraordinary powers of a Court of Equity to assist in miscellaneous stock-jobbing operations. * * * The decree of a chancellor is the exercise of a sound discretion ; it is of grace, not of right, and will never be made where the equity and justice of a case is not clear." In this connection the plaintiff relied upon *Barnes* v. *Brown*, 80 N. Y., and *Cook on Corporations*, sec. 622, which is based upon the case just cited, for the proposition that a contract by which directors who *own a majority of the stock* agree to sell it and substitute the vendees as directors of the company is *not illegal.* But the situation here is quite different, for neither the vendors nor the vendee had a majority and therefore it is clear, and it was so contended by the plaintiffs' counsel, that the object of the contract was to give him the majority by uniting his holdings to those of the defendants. In addition to this it may be observed, that we may concede for the purpose of the argument of this branch of the case that the alleged contract is *not illegal.* But it does not follow that because it is not illegal it is equitable and should be enforced by a Court of Equity. As was said by the Supreme Court of Pennsylvania in *Foll's appeal, supra,* if parties were able to obtain control by purchase, it cannot be helped, but here is a *quasi* public corporation in which the minority stockholders and the public are to be considered. If the plaintiff has any legal rights let him enforce them in a Court of law. What we have said cannot, of course, be taken to indicate that we are of opinion that there may not be many cases in which a Court of Equity will specifically enforce contracts for the sale of railway or other shares. It is said in *Sec. 338, Cook on Stockholders:* " If the stock contracted to be sold is easily obtainable in the market, and there are no

particular reasons why a vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertained, or the stock is not to be readily obtained elsewhere, or there is some *particular and reasonable* cause for the vendee's requiring the stock contracted for to be delivered, a Court of Equity will decree a specific performance and compel the vendor to deliver the stock." *Gottschalk* v. *Stein*, 69 Md. 51. This is a sufficient statement of the general rule. But, of course, if it be true, as we have pointed out, that the cause or reason why the plaintiff here demands the stock is not *equitable*, and therefore not *reasonable*, the Court will not decree specific performance, although the value of the stock is difficult to ascertain and cannot be obtained elsewhere. But in this case, however difficult it may be to obtain the stock elsewhere, it is not difficult to ascertain its value, for in the bill filed in United States Circuit Court by the plaintiff he alleges that its value is $100 per share.

(2) But assuming that the contract is not illegal, let us examine it and ascertain, if we can, its true meaning.

We have already seen what this contract is—and we have also said how far and in what sense the demurrer admits the allegations of the bill. The bill alleges that before the agreement was made, and while negotiations were pending, the defendants, McLane, Robinson and Watts, informed him they were acting as a "Committee representing a large amount of stock in said corporation *held* by others." In view of the fact that the plaintiff studiously refrains from alleging his want of knowledge of the existence of the pooling agreement before and at the time he entered into the contract of October 6th, and remembering that the contract is made by the defendants as a *committee* in behalf of themselves and associate stockholders, and in behalf of all stockholders who should join with them before a certain date, and that the plaintiff declared that he was willing and desirous to purchase all the shares of stock held by *said committee* as the same may be *pooled* and *deposited* prior to the

date mentioned, the construction now placed upon the con-tract by the plaintiff, absolutely abrogating, as it does, the pooling agreement, is, to say the least, not a reasonable one.

If this pooling agreement was, as contended, so destroyed on the 6th October, why should the defendants, constitut-ing the committee, on the next day, send circulars to all the stockholders to join in the pool ?  But in addition to this, the date named in the circulars, 18th October, 1896, is the very day named in the contract on or before which the stock, the plaintiff was willing to purchase, was to be pooled and deposited.  It is unnecessary, however, further to discuss this question, for the counsel of the plaintiff prac-tically conceded that the plaintiff was fully aware on Octo-ber 6th of the existence of the pooling agreement of Octo-ber 2nd.  But whether he was in fact fully informed of the existence and terms of the pooling agreement, he has never denied the possession of such knowledge, in spite of the fact that such a denial and the proof of its truth, form the very foundation of his case.  For it is obvious that if it be once conceded that both parties knew of the existence of the pooling agreement, it must follow that they contracted with reference and subject to its provisions—unless it be null and void as alleged in the bill.  We will presently dis-cuss the effect of the nullity of the pooling agreement.  If then we are to consider the pooling agreement as an ele-ment in this case, it seems to us that the contention of the plaintiff, though supported with great force and ingenuity, must fail to the ground.  For instead of being, as contended by the plaintiffs, a completed contract for the sale of stock, it was but "a pending offer" or an "option," which must, according to the pooling agreement, be ratified by stock-holders holding three-fourths of the Seaboard Company's stock, and accepted by the plaintiff.  Now what are the broad features of the contract which challenge attention ? First, that the contract on the one side is made by a *com-mittee* already existing, previously created ; secondly, that

*all* the stock of all the stockholders who should join the pool before the 18th October was the subject of negotiations ; third, that the contract looked to an "intended purchase" and not an actual sale ; fourth, that neither the vendors nor the vendees are disclosed—the former being represented by the committee—and the latter acting by and through the plaintiff.

At the very beginning of the so-called contract it appears that the parties thereto are the *committee* and Thomas F. Ryan on behalf of himself and associates, and that the stock which the committee was desirous of selling was all the stock in the pool. When we look to the allegations of the bill in the sixth paragraph in reference to the negotiations there referred to, and the failure of the plaintiff to deny knowledge of the pooling agreement, which of itself under the facts in this case is equivalent to an admission of knowledge, can it be doubted that the plaintiff made the so-called contract of sale subject to the previous contract ? If so, the second contract was, and must have been, in the nature of an offer or option. It seems to us perfectly clear that the parties themselves directly and pointedly refer to and recognize the existence of the pooling agreement in the second article in which there is a clear distinction drawn between the contract and the pooling agreement. " Second. The *committee* is to declare the amount of all stock deposited with *the said pool* and embraced in *this contract of sale* on October 18th, 1896." Of course *the said pool* must refer to, can have no other reference than to the pool formed by the pooling agreement, and *the contract of sale*, it is equally clear, must refer to the *intended purchase*, which the paper was executed to carry out. But when we examine the subsequent part of the paper we find that the parties themselves give it its proper character—for in the fifth paragraph the language used is : " Simultaneously with the closing of the *said option* by the party of the second part," and the performance of certain other things, the committee were, if requested by the plaintiff, to provide for the resig-

nation of president and directors of the Seaboard Company and its controlled corporations.   We think there can be no question that the words here used relate to the contract now relied on by the plaintiff as a complete and absolute contract of sale which he comes into a Court of Equity to have specifically performed.   In addition to this, however, the record shows in his bill, filed in 1897, in the Eastern District of Virginia, one of the exhibits filed with the bill in this case, that the plaintiff himself called his absolute contract only "*a pending offer.*"   And in the bill filed in the Circuit Court of the United States he again speaks of the contract of sale as "an option."   But it also appears that the plaintiff on his part agrees to do nothing until in the fourth paragraph he "agrees" that the sum of $60,000 which he deposits with the committee shall be forfeited and paid as liquidated damages in case he and his associates (whoever they may be) fail, at the expiration of forty days "*to accept,*" take, and pay for *all* such *pool stock* as agreed. Under the circumstances as disclosed by the bill, what better arrangement could the plaintiff make?   He was trying to get enough, just enough stock to control.   He had other options or negotiations outstanding, and if he found there would be stock enough in the pool, added to what he had or had secured, to give him control, he would accept—otherwise he would not accept, but would forfeit the deposit of $60,000.   It seems to us that this is what the contract means.   He and his associates were willing, therefore, to risk the loss of a part of the $60,000 (for he would get back part of it as a stockholder) in the hopes of gaining what they had been striving for, namely, the control of the Seaboard Company and the other corporations operated by it.   From what we have said, it will be seen that we are of opinion that the contract relied on by the plaintiff is not an absolute contract of purchase and sale, but it is a mere "pending offer," as he called it, or "an option," as it is called by the parties themselves in the paper itself.   If this be so, of course, it requires neither authority nor reasoning

to show that equity will not enforce such a contract—for both must be bound to give either a standing in a Court of Equity. *Fry on Specific Perf.*, sec. 114–148; *Fry on Specific Perf.*, sec. 440; *Pomeroy on Specific Perf.*, 162–166; *Gelston* v. *Sigmund*, 27 Md. 344; *Duval* v. *Myers*, 2 Md. Ch. 405; *King* v. *Warfield*, 67 Md. 249; *O'Brien* v. *Pentz*, 48 Md. 577; *Bamberger* v. *Johnson*, 86 Md. 41; *Horner* v. *Woodland*, 88 Md. 511.

(3) Much reliance was placed upon the supposed consequences of the admissions claimed to have resulted by the demurrer to the allegations contained in paragraph 14A, which is an amendment to the original bill. This amendment appears to have been made for the purpose of getting rid of the pooling agreement, and it was contended with much earnestness that the plaintiff having averred therein, first, that none of the parties to the contract of October 6th made it with reference to or in connection with the pooling agreement; and secondly, that all the then parties who signed said pooling agreement had fully authorized the committee to make the contract of sale, that unless we dispense altogether with the rule that facts which are averred are to be taken as true on demurrer, it is impossible to come to any other conclusion than that the contract of sale of October 6th was not made with reference to, or in connection with, the pooling agreement. But this position gives a conclusiveness to the supposed admissions resulting from the demurrer to the allegations in respect to the *construction* of the plaintiff, placed by him upon the two agreements here involved, that cannot be properly conceded to them. For, after all, the *true* construction of the contracts, and not the construction placed upon them by the plaintiff, must govern the rights of the parties. It is apparent from what we have already said, that as we construe the contract the whole negotiation between the plaintiff and defendant was made subject to the pooling agreement, and that the same fact is apparent from the face of the contract of sale itself. We think it equally clear that according to the plain construction

of the pooling agreement the parties who *then*, that is on October 6th, are alleged in the bill to have held 3,000 shares, could not have authorized the committee to make the contract of sale as construed by the plaintiff, for by the very terms of the pooling agreement three-fourths of the stock pooled before 18th October were required to authorize a sale, that is to say, more than 6,000 shares were required to authorize the committee to make the sale, or double the amount of stock held by those alleged to have given such authority, for it appears that there were some 8,500 shares pooled before the date mentioned.

In conclusion, a few words in regard to the alleged nullity or invalidity of the pooling contract. It appears to be clear that whether this contract be valid or not is immaterial in this case. We have in the former part of this opinion arrived at the conclusion that the two contracts, the pooling agreement and the so-called contract of sale, are so connected, the latter having been made subject to the provisions of the former, that it would seem necessarily to follow if the former be declared void, it would be inequitable to enforce the latter ; and if the former be held to be a valid and binding contract the sale claimed by the plaintiff to have been made to him, never having been concurred in by those holding three-fourths of the pooled stock, such alleged sale is no sale and cannot be enforced.

There are other grounds on which the defendants relied, which were ably discussed and sustained by the citation of numerous authorities ; but we think what we have said is sufficient to justify the conclusions we have reached.

> *Decree affirmed with costs to de-*
> *fendants above and below.*

(Decided April 6th, 1900.)