## 𝕽𝕚𝕔𝕙𝕞𝕠𝕟𝕕.

## VAN DYKE AND OTHERS V. NORFOLK SOUTHERN RAILROAD COMPANY AND OTHERS.

### November 16, 1911.

1. DEMURRER—*Admissions.*—A demurrer admits as true all facts well pleaded, but does not admit conclusions of law from those facts which the pleader has seen fit to introduce into his pleading.

2. DEMURRER—*Awaiting Hearing on Merits—Specific Performance.*— While there are cases in which it is within the discretion of the court to overrule a demurrer and postpone the questions of law until they can be determined upon a full discovery and development of all the facts, as where all the questions to be decided involve inferences of fact, and the interests at stake are weighty, such is not true of a bill for the specific performance of a contract. Where a bill seeks the specific performance or rescission of a contract, the general rule governing the consideration of a demurrer applies alike to all cases regardless of the magnitude of the interests involved.

3. SPECIFIC PERFORMANCE—*Incompleteness of Contract—Uncertainty—Demurrer.*—In a suit for the specific performance of a contract, it must appear from the bill that the contract asked to be enforced is complete and certain, so that the court may see that it will not encounter the risk of doing injustice to the defendant and others if the contract be enforced, otherwise the bill will be bad on demurrer. A contract that is incomplete, uncertain or indefinite in its material terms will not be specifically enforced in equity. A contract is incomplete when one or more of its material terms have been entirely omitted. It is uncertain when one or more of such terms have been expressed in language so inexact, indefinite, or obscure that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect.

Appeal from a decree of the Circuit Court of the city of Norfolk. Decree for the defendants. Complainants appeal.

*Affirmed.*

The opinion states the case.

*R. T. Thorp, Tazewell Taylor* and *Thomas Leaming,* for the appellants.

*E. R. Baird, Jr., T. L. Chadbourne, Jr.,* and *Frederick Hoff,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

This appeal is taken from a decree of the circuit court sustaining the demurrers of appellees to a bill filed by appellants seeking specific enforcement of a certain written memorandum of a contract bearing date January 19, 1909, made by and between appellants Van Dyke and Zell on behalf of themselves and others composing a syndicate, and appellees Schoonmaker and Clark, on behalf of themselves and others, acting as a reorganization committee for the bondholders of the Norfolk Southern Railroad Company.

The contention of appellants is that by the alleged contract the syndicate agreed to purchase certain of the bonds of a new company to be organized, and to procure a certain guaranty of other bonds, and that the reorganization committee agreed to complete foreclosure and to convey the properties of the railroad company, when acquired, to the new corporation to be created by the syndicate. It is further contended that the agreement, although oral, was perpetuated by a memorandum signed by the parties on the day of its making, and is also evidenced by a subsequent memorandum signed by appellees, the agreement or contract sought to be enforced being as follows:

"Preliminary agreement reached January 19, 1909, by the undersigned respecting the Norfolk and Southern Railway Company Reorganization.

"First Mortgage: $9,000,000 4 *per cent.* on railroad to be taken by Syndicate at 90.

"General Mortgage: First on Lumber Company, and second on railroad, $16,000,000, to bear 4¼ *per cent.* interest, to be given present refunding bondholders ($14,000,-000) and balance $2,000,000 to remain in treasury of the company, and to be used for the acquisition of new property and strict betterments.

"$14,000,000.00 of general mortgage bonds to have the interest guaranteed for five years (Surety Company guarantee) as approved by committee's counsel.

"$16,000,000.00 of stock, of which $6,500,000 goes to present bondholders, and balance, $9,500,000, goes to Syndicate.

"Sinking Fund: To begin to operate two years from date of conveyance to New Company.

|  |  |
|---|---|
| "S. L. S. | J. W. VD. |
| "G. C. C. | F. D. Z." |

The memorandum signed by appellees, and which, as appellants claim, evidenced the written contract of January. 19, 1909, is filed with the bill as "Exhibit 2," but we deem it only necessary to refer to that memorandum as we review appellants' bill upon the demurrers thereto.

"Exhibit 1" with the bill is called "Modified Plan and Agreement," bearing no date and containing only a notice addressed to the holders of the first and refunding mortgage bonds of the old company, not signed by any committee or anyone else, and annexed to the notice is a proposed plan of reorganization, but which does not contain any agreement of reorganization. In this draft, "Modified Plan," is contained a statement that when in the *discretion* of the reorganization committee "a sufficient amount of all the outstanding first and refunding mortgage bonds of the company shall have been deposited under the accompanying agreement, the property of the existing Norfolk and Southern Railway Company will be foreclosed."

The material facts out of which this suit arises, appearing from the bill and the exhibits therewith, are as follows: The Norfolk and Southern Railway Company was a consolidated corporation, existing under the laws of Virginia and North Carolina, owning a valuable line of railroad extending from Norfolk, Virginia, through the States of Virginia and North Carolina for about six hundred miles, and also controlling valuable timber property in both of said States, held by the John L. Roper Company. The railway company had executed its first and refunding mortgage to the Trust Company of America, as trustee, creating a lien upon the properties owned by the company, under which mortgage it had issued bonds which were outstanding in the public to the extent of $14,000,000 par value, each bond being of the par value of $1,000, and in addition thereto had pledged a further issue of $1,000,000 par value of such bonds.

On or about July 1, 1908, the said trust company, as trustee under the aforesaid mortgage, instituted proceedings in the United States court for the Eastern District of Virginia to foreclose the mortgage securing said bonds, and receivers were appointed. Whereupon, some of the first and refunding mortgage bondholders, desirous of protecting their interests, and for the purpose of reorganizing the Norfolk and Southern Railway Company, formulated a plan and agreement of reorganization, under which appellees Clark, Schoonmaker, Thorne, Gardner and Waterbury became a reorganization committee, and, as appears from the preamble to "Exhibit 2," holders of a large majority of bonds had deposited their holdings and accepted, in accordance with the plan and agreement of reorganization, certificates of deposit therefor. The plan and agreement of reorganization, which was the initial step taken by certain of the bondholders, and under which other bondholders

necessarily would have the right to participate in accordance with its terms, is referred to in the preamble to "Exhibit 2" as Schedule A, but it is not attached, and there is no reference to it contained in appellants' bill other than such as appears in "Exhibit 2."

It is to be noted in this connection, and as a matter to be considered throughout the case, that those bondholders who had deposited their bonds under the original plan of reorganization became the owners of certificates of deposit, which themselves no longer represented first and refunding mortgage bonds, but such rights and properties as such certificates would be entitled to upon reorganization in accordance with such original plan of reorganization.

We shall confine our consideration of the allegations of the bill to such as are essential to the relief asked and which are called in question by the demurrers of the respondents, which demurrers are filed by the Norfolk Southern Railroad Company, the corporate respondent, and by Rathbone Gardner and the other respondents jointly, acting as a reorganization committee of the bondholders of the Norfolk and Southern Railway Company and for themselves, jointly and severally, as individuals.

The first paragraph of the bill states that appellants associated themselves together as a syndicate for the purpose of acquiring the properties formerly belonging to the Norfolk and Southern Railway Company and organizing a corporation to take over and operate the same; but, as pointed out in the demurrers filed by appellees, it does not appear that such corporation was ever formed by appellants. On the contrary, it is later alleged in the bill, that the individual appellees composing the reorganization committee organized the Norfolk Southern *Railroad* Company with the intent to vest in said company the property of the old company. To this, however, we do not attach much importance:

In paragraph second of the bill it is stated, that the individual respondents constitute a committee representing first and refunding mortgage bondholders of the Norfolk and Southern Railway Company; that in the transactions narrated in the bill this committee were acting on behalf of themselves and the holders of the first and refunding mortgage bonds, whom they represented; and that the appellee Norfolk Southern Railroad Company was created at the instance of the reorganization committee for the purpose of taking over the properties acquired by them at the foreclosure of the mortgage of the old company. It is, therefore, sought in this connection to charge the individual respondents solely in a representative capacity, while their principals, the first and refunding mortgage bondholders, are not made parties to the bill.

The third paragraph of the bill is but a recital of the incorporation of the old company and the making by it of the first and refunding mortgage to the Trust Company of America, as trustee, which recitals are followed by a description of the property and the action taken upon the foreclosure of the said first and refunding mortgage.

In its fourth paragraph the bill states that a meeting was had on January 19, 1909, between appellees Clark and Schoonmaker and appellants Zell and Van Dyke, and that at said meeting Clark and Schoonmaker told Zell and Van Dyke that they appeared as the representatives of the individual appellees, acting as a reorganization committee, and that they were further acting as agents for a majority of the first and refunding mortgage bondholders, and that they were authorized and empowered by the committee and by such majority of said mortgage bondholders to conclude an agreement with appellants. It is further stated that appellants expected to prove that Clark and Schoonmaker had been empowered by resolution of the committee to negotiate and conclude an agreement, and that they had been

empowered by a majority of the first and refunding mortgage bondholders to negotiate and conclude an agreement. A statement follows the foregoing, to the effect that Zell and Van Dyke stated to Clark and Schoonmaker that they represented a syndicate comprising the appellants, and were authorized to negotiate and conclude an agreement with Clark and Schoonmaker as the agents of the committee and of said bondholders.

"Exhibit 2" which is attached to the bills shows that the appellants had knowledge of an existing agreement of reorganization, wherein the powers of the committee, or its members, must of necessity have been fixed and expressed, and under which there had become parties thereto holders of certificates of deposit representing the securities thereunder deposited. This original plan and agreement of reorganization referred to in "Exhibit 2" is not attached to appellants' bill, although whatever power or authority was vested in Clark and Schoonmaker, or the committee itself, was so vested and fixed by such plan and agreement of reorganization, and in the absence of which it is by no means made clear how the court could ascertain the authority of the committee to act, or of a majority of the bondholders to bind all. In this connection it is also stated that prior to said meeting (of January 19, 1909) a plan of reorganization had been adopted by the counsel for the reorganization committee, and without stating in what manner and by what authority, but merely as a conclusion, it is alleged that Clark and Schoonmaker, acting for the committee and the first and refunding mortgage bondholders, modified such plan of reorganization as set forth, which alleged modifications were of substantial difference and import, in that they changed the securities to be issued by the proposed new company under the prior plan of reorganization by increase and decrease of millions of dollars.

106

The next allegation is that at said meeting a complete, final and binding contract, etc., was reached, to the effect that the draft thereof, modified in the particulars stated, should be put into effect by means of a further agreement' then finally and completely made as a binding contract between the parties to the negotiations, and to the effect that the syndicate should purchase $9,000,000 of first mortgage bonds at 90 *per cent.*, and procure a guaranty by a surety company (in a form to be approved by the counsel for the reorganization committee) of the interest upon $14,000,000 general mortgage bonds for five years, and that the reorganization committee agreed, in consideration of the same, that the syndicate should receive $9,500,000 of the capital stock of the new company.

Then follows the statement, that the effect of the agreement reached was to modify the plan of reorganization, making it more favorable' to the bondholders, and to bind the syndicate to finance the reorganization upon that basis. It was further agreed that the reorganization committee, on behalf of the first and refunding mortgage bondholders, should endeavor to buy at the foreclosure sale the properties, rights and franchises of the Norfolk and Southern Railway Company, and that a new company should be incorporated, in which should be vested the said properties, rights and franchises, which company should issue the securities specified in the plan marked "Exhibit 1" modified as above set forth.

"Exhibit 1," labeled "Modified Plan and Agreement," bears no date and contains a notice addressed to holders of first and refunding mortgage bonds, not signed by any committee or having annexed to it any plan of reorganization, and omits to state any agreement of reorganization. In this "modified plan" appears the statement that when, in the discretion of the reorganization committee, "a sufficient amount of all the outstanding first and refunding mortgage bonds of the company shall have been deposited under

the accompanying agreement, the property of the existing
Norfolk and Southern Railway Company will be foreclosed."
Here we have presented by the bill of complaint a draft of
a "modified plan" providing for the deposit of bonds under
an agreement of reorganization which does not accompany
the draft of the plan, and which the bill does not show or
allege; nor is it shown or alleged that bonds were deposited
thereunder; so that, upon the face of the bill all that had
been approved by anyone was a draft of "modified plan"
in which there is a reference to an agreement of reorganiza-
tion, but whether such an agreement ever existed does not
appear.

Paragraph fifth of the bill again refers to and alleges the
execution of the memorandum made on the 19th of January,
1909, which memorandum of agreement is the basis of
appellants' entire case, and which they ask to be specifically
enforced. It is entitled, "Preliminary Agreement—reached
January 19, 1909."

In the sixth paragraph of the bill it is alleged that the
act of Clark and Schoonmaker was ratified, approved and
confirmed as the act and deed of the first and refunding
mortgage bondholders, but this is but an allegation of a con-
clusion of law, since there are no facts stated or data exhib-
ited with the bill to show upon what the allegation is based.
In fact, it is stated that the appellants "are not aware of the
full and exact manner and methods by which said ratifica-
tion, approval and adoption was effected," "but they were
informed, believe and expect to prove that their (the bond-
holders') assent was had in writing, partly by power of
attorney duly executed, etc.; that appellants had called upon
the reorganization committee and its counsel for discovery
as to all papers and documents showing the assent of the
bondholders to said agreement, but were refused access to
any and all information on the subject, but they particu-
larly aver that they were continuously advised by said

reorganization committee and its counsel that prior to the delivery of a certain more formal contract on or about January 30, 1909, hereto attached and referred to as 'Exhibit 2,' the full, express and written approval of the bondholders to said agreement (of January 19, 1909) was obtained."

It is apparent from their indefinite allegations and an examination of "Exhibit 2," that while the said bondholders (how many, who they were, and how they could bind their assigns or other bondholders, does not appear) may have approved of the act of Clark and Schoonmaker, which from the bill itself was preliminary only, there is nothing to show that the bondholders ever deposited their bonds under the agreement referred to in the draft of "modified plan," or how those who deposited their bonds under an original plan and agreement could have deposited under another plan bonds they had already relinquished; nor is it made to appear in the bill or in the exhibits therewith under which plan appellants seek to charge the individual defendants (appellees here) as a committee. As proof of the fact that the bondholders have approved of the alleged agreement of January 19, 1909, here sought to be enforced, great reliance is placed upon a recital in the proposed draft of an agreement—"Exhibit 2." It is recited in the preamble to this proposed agreement that certain *certificate holders,* representing in amount a majority of outstanding first and refunding mortgage bonds, had approved an amended plan which that agreement contemplated would be attached thereto; but this proposed agreement ("Exhibit 2") was never executed by both parties and, therefore, was never brought into effect. On the contrary, the bill, after stating how this proposed agreement came to be drawn up as "a more formal contract to be executed by the committee and the members of the syndicate," proceeds to state the reasons why the members of the syndicate (appellants) would not

acquiesce in certain of its provisions and affix their signatures thereto. Had this proposed "more formal agreement" been executed by the parties, it plainly contemplated that the committee would use its efforts as a committee to have an amended plan adopted by all the bondholders; and it does not appear from the bill that the alleged draft of modified plan was ever adopted by the bondholders, nor does it appear that the committee purchased the properties of the railroad company at foreclosure under the draft of modified plan, which plan provided that it would be discretionary with the committee to buy thereunder.

In fact, it is not made to appear in the bill that there was any express agreement that the committee would purchase under the draft of modified plan, or any other named plan, but it contains only an allegation to the effect that the committee was to *endeavor* to buy at foreclosure and issue the securities specified in the draft of *modified* plan. How the committee could have exercised the discretionary right alleged to have been conferred upon them by the draft of modified plan until there had been a deposit of the bonds of the old railway company under that plan is not made to appear.

Paragraph seventh of the bill is characterized by vague and indefinite allegations of facts. Here it is repeated how the proposed agreement, "Exhibit 2," came to be drawn to embody the provisions of the alleged agreement reached January 19, 1909, in a more formal contract *"to be executed by the committee and the members* of the syndicate," and following it is alleged that "Exhibit 2" was drafted by Burr, of counsel for the syndicate, and Chadbourne, of counsel for the committee, and one copy thereof signed and retained by the committee and an unsigned copy forwarded to Burr, and that a "Schedule A" and an "Exhibit B" were referred to in such draft of agreement but not annexed. What was contained in "Schedule A" the bill does not state,

but the agreement "Exhibit 2" designates it as the original plan and agreement of reorganization under which bonds had been deposited. It is alleged that "Exhibit B" was in existence and designed to be attached to "Exhibit 2," but it is admitted that no copy thereof was in fact attached to the copy of the agreement delivered to Burr. If it be accepted as true, the statement in the bill that the "Exhibit B" to be attached represented appellants' "Exhibit 1," that exhibit itself (the modified plan) was not in existence, but would have required subsequent action by the bondholders becoming parties to an agreement of reorganization. No such action on the part of the bondholders is shown by appellants, or attached to the papers they rely on, and as to which they make no comment; nor do they recognize that the action of the committee in purchasing at the fore-closure sale was discretionary and that discretion to be exer-cised when sufficient bonds had been deposited, etc.

In paragraph eight of the bill it is related that the form of the contract executed by the committee (Chadbourne— Draft of Contract "Exhibit 2"), having no date, was exe-cuted before it was submitted to the syndicate or Burr as counsel for the syndicate, and that he (Burr), on behalf of the syndicate, advised counsel for the committee, "that while the same substantially represented the agreement between the parties," in certain particulars it did not accord there-with; and then follows in this paragraph of the bill a speci-fication of the particulars referred to. It is here also alleged and set forth that various notices were sent to the commit-tee by the syndicate from time to time, in which they refer to a contract having been made by the reorganization com-mittee and a large majority of the first and refunding mortgage bondholders, and it is further stated that on De-cember 7, 1909, the reorganization committee purchased all the assets of the Norfolk and Southern Railway Company at foreclosure sale, but it is not alleged in this connection whether said committee purchased such properties in

accordance with the existing plan and agreement of reorganization or of any other plan. Reference is also made in this connection to an attempt made by appellants on or about September 23, 1910, to intervene in the foreclosure suit pending in the Federal court, and that court's refusal to take jurisdiction of their controversy; but to this statement of fact and the conclusion of law, that such refusal was made for want of jurisdiction, we attach no importance.

The only other feature of the bill to which we deem it necessary to refer is the sixteenth paragraph thereof, in which it is alleged that the reorganization committee caused to be organized the Norfolk Southern Railroad Company, and that it was organized by the committee with the intent to vest in said company the property so purchased, contrary to the rights of the appellants and in breach of the alleged contract of January 19, 1909; that said company was an instrumentality created by the individual defendants (appellees), as the reorganization committee, for the purpose of defeating the rights of the appellants and depriving them of the property formerly of the Norfolk and Southern Railway Company, to which appellants claim they are entitled under the agreement of January 19, 1909, "upon payment to said reorganization committee of the consideration provided for in the contract"; and that it is sought by the committee to carry out a plan of reorganization wholly at variance with the agreement of January 19, 1909, and in fraud of the rights of the appellants.

The special relief prayed in the bill is that the defendant Norfolk Southern Railroad Company be required either (a) to issue its securities to appellants in the manner provided in the plan of reorganization ("to this bill attached marked 'Exhibit 1' "), as modified by the agreement between the reorganization committee and appellants dated January 19, 1909, upon performance by appellants of the

various matters and things stipulated to be done by them in said contract, *or* (b) that it be adjudicated and decreed that the properties, rights and franchises acquired by the reorganization committee at the foreclosure sale shall be transferred to a new corporation to be formed by appellants in accordance with the terms of the agreement between themselves and the reorganization committee, and that the securities of said new corporation be issued in accordance with the terms and provisions of the contract between the parties.

The general rule is that, by demurrer to a bill in equity, the truth of material and relevant matters, i. e., matters of fact, set forth with requisite precision, and which are well pleaded, is admitted, but not conclusions of law suggested in the bill or inferred from the facts stated.   1 Daniel's Chy. Pr. (5th Am. ed.) 546; Stephen on Pleading, p. 138; 12 Enc. Pl. &. Pr., p. 1026; Foster on Fed. Practice (4th ed.), p. 474; *Dillon* v. *Barnard,* 21 Wall. 430, 22 L. Ed. 673.

"A demurrer admits as true all facts which are properly pleaded, but does not admit the conclusions of law from those facts which the pleader may have seen fit to introduce." *Trumbo* v. *Fulk,* 103 Va. 73, 48 S. E. 525.   See also *Latham* v. *Westervelt,* 26 Barb. (N. Y.) 259; *Ryan* v. *Mc-Lane,* 91 Md. 175, 46 Atl. 340, 80 Am. St. Rep. 438, 50 L. R. A. 501; 1 Barton's Chy. Pr. 368.

Recognizing the force and effect of the general rule just adverted to, when applied to the bill in this case, the learned counsel for appellants invoke the doctrine, that where all the questions involve inferences of fact and the interests at stake are weighty, it is entirely within the discretion of the court to overrule the demurrer and postpone the questions of law until they can be determined upon a full discovery and development of all the facts; and it is argued that not only is such a course of procedure within the discretion of the court, but it may be said to be essential in a case

of magnitude and where conclusions of law rest upon inferences to be drawn from a series of complex and involved occurrences and facts.

Among the cases cited in support of this contention is that of *Kansas* v. *Colorado,* 185 U. S. 125, 22 Sup. Ct. 552, 46 L. Ed. 838, where the opinion does cite Daniel's Chy. Pr. for the proposition that a court of equity sometimes declines to decide a doubtful question (of title) on demurrer; but we need only say here that to apply that doctrine to all cases of magnitude, i. e., where large interests are involved, would be practically to abolish the office of a demurrer in such cases. Moreover, the character of the case in which the citation of Daniel's Chy. Pr. was made and followed was very different from the case at bar, and none of the conditions upon which the court might depart from the general rule governing in the consideration of a bill in equity upon a demurrer thereto, pointed out by Mr. Daniel, exist in this case.

The rule governing the consideration of a bill in equity upon a demurrer thereto, where the relief asked is the specific performance or rescission of a contract, applies alike to all such cases regardless of the magnitude of the interests involved. That equity will not enforce a contract the terms of which are uncertain, is well established.

As said by this court in the opinion by Harrison, J., in *Berry* v. *Wortham,* 96 Va. 89, 30 S. E. 444: "It is an elementary doctrine of courts of equity that they will not specifically enforce any contract unless it be complete and certain."

It must appear from the bill, considered upon demurrer thereto, that the contract asked to be enforced is complete and certain, so that it may be seen that a court of equity would not encounter risk of doing injustice to the defendants and others if it enforced the contract, otherwise the

107

demurrer has to be sustained.    *Clinchfield Coal Co.* v. *Clint-wood Coal Co.,* 108 Va. 433, 62 S. E. 329.

In other words, the court must be enabled to say from the facts and circumstances alleged in the bill whether the minds of the parties met upon all the essential particulars of the contract, and if they did, then can say exactly upon what substantial terms they agreed and trace out the particular line where their minds met.    This is the settled rule where such a case is determined upon the proofs (*Clinchfield Coal Co.* v. *Powers,* 107 Va. 393, 59 S. E. 370), and must necessarily be applied in the consideration of a bill upon demurrer thereto where specific enforce. ment of a contract is asked; otherwise, the pleader could make one case by his bill and prove another or different one, or make an imperfect statement of it and supply its lacking essentials by proof, as to which the defendant had no notice from the bill of complaint filed against him.

The allegations of the bill we are considering here are very unsatisfactory and in many particulars difficult to comprehend, due to the fact, admitted, that the negotiations between appellants and the individual appellees, relied on as evidencing the contract asked to be enforced, were so complicated that they are not and could not be precisely stated so as to show that a contract which a court of equity could undertake to enforce was ever entered into and consummated by the parties.    As we have seen, the alleged agreement of January 19, 1909, set out in full above, is the contract asked to be enforced, yet that document is designated in its caption, "Preliminary Agreement," indicating a more complete agreement to follow, and the parties asking its enforcement have to rely upon "Exhibit 2" with their bill as a ratification of the contract sought to be enforced, and that too in face of the fact that they state that they refused to consent to this modified plan, "Exhibit 2," and give their reasons for refusing.    As we have observed, the

modifications embodied in "Exhibit 2" were of substantial difference and import, and from the allegations of the bill they wrought changes of the securities stipulated for in the "Preliminary Agreement" by increase and decrease of millions of dollars. So that we have, according to the allegations of the bill, this case: the agreement of January 19, 1909, declared to be a "Preliminary Agreement"—a mere skeleton of an agreement itself, plainly indicating that there were other essential conditions and terms to be agreed upon between the contracting parties—never signed or assented to by the individual appellees acting as a reorganization committee, or ratified or approved by the bondholders of the old company, on the one hand, and on the other "Exhibit 2" with the bill, signed only by the committee, disapproved of by appellants and never signed by them or anyone for them.

"A contract that is incomplete, uncertain or indefinite in its material terms will not be specifically enforced in equity. Following the general principles of equity, there is required a greater degree of certainty and definiteness for specific performance than to obtain damages at law. For specific performance is required that degree of certainty which leaves in the mind of the chancellor or court no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is to compel done. The element of *completeness* denotes that the contract embraces all the material terms; that of certainty denotes that each one of these terms is expressed in a sufficiently exact and definite manner. An incomplete contract, therefore, is one from which one or more material terms have been entirely omitted. An uncertain contract is one which may, indeed, embrace all the material terms, but one or more of them is expressed in so inexact, indefinite or obscure language, that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect." 6 Pom. Eq. Jur.,

sec. 764; *Creecy* v. *Grief,* 108 Va. 320, 61 S. E. 769; *Clinch-field Coal Co.* v. *Powers, supra; Ford* v. *Euker,* 86 Va. 75, 9 S. E. 500.

Giving to appellants the benefit of all the admissions of facts well pleaded in their bill to which they are entitled upon the demurrers thereto, they have not set out a completed contract with that degree of certainty and definiteness which the general principles of equity require. Indeed, they fail to show that the minds of the parties ever met on all the essential particulars of any contract, or in fact upon what substantial terms they agreed. On the contrary, the bill but sets out various negotiations between the parties, which doubtless had in view the making of a completed contract in the nature of the one asked to be enforced, but does not allege facts to show that any such contract was in fact entered into, nor from the facts stated could a court of equity trace out any particular line where the minds of the parties met in said negotiations with respect to the terms of any contract sufficiently certain and definite to enable the court to determine with any degree of accuracy what the parties intended.

It follows that we are of the opinion that the decree appealed from, sustaining the demurrer to the bill and dismissing the same, should be affirmed.

*Affirmed.*