## O. E. CRAIN v. STATE.

No. A-3833.   Opinion Filed June 4, 1923.
Rehearing Denied Sept. 15, 1923.
(217 Pac. 888.)

(Syllabus.)

1. **Indictment and Information—Instruction as to Lower Grades of Assault According to Evidence.** Where the accused is charged with an assault with intent to kill, and where the evidence indicated that some lesser degree of assault may have been committed, instructions as to other grades of assault as given were not erroneous.

2. **Trial—Witnesses—Impeachment—Foundation for Evidence of Conflicting Statement—Waiver of Error—Harmless Error.** Where an attempt is made to impeach a witness (in this case the defendant) by showing that at another time he made a different or conflicting statement as to the circumstances of an affray, some foundation should be laid for the introduction of such impeaching testimony, specifically calling his attention to such discrepancies in order to afford the witness an opportunity to explain or deny the impeaching testimony.

   (a) A violation of this rule is error, but the error may be waived, and under some circumstances may be considered harmless.

Appeal from District Court, Greer County; T. P. Clay, Judge.

O. E. Crain was convicted of assault with a dangerous weapon, and he appeals. Affirmed.

Stewart & Edwards, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. O. E. Crain, plaintiff in error, here referred to as the defendant, was on February 25, 1920, by a verdict of a jury found guilty of an assault with a dangerous weapon, without excusable or justifiable cause, and his punishment assessed at one year in the penitentiary. From the judgment on this verdict he appeals.

Steve Jordan, a negro 51 years old, in company with his stepson, was riding in a buggy in the highway, about 450 feet from the residence of the defendant. The defendant, for some unexplained reason, took with him his Winchester rifle and stood beside the road where these negroes were about to pass. Both negroes say that as they approached the spot where the defendant was, and when they were about 40 or 50 yards distant, the defendant picked up his gun and began to shoot at them, firing seven or eight shots, four of which seriously injured Jordan; one shot passing entirely through his body. The stepson leaped from the buggy and ran away. Jordan drove on to a neighbor's, where he was given medical attention. Both Jordan and his stepson say they were unarmed, and this is corroborated by this neighbor and by the fact that no gun or cartridges were ever found on their persons, in the buggy, or along the highway or elsewhere. There was some evidence that defendant tried to induce two neighbors to testify in defendant's behalf to the effect that they, at a distance, saw smoke coming from the buggy while the shooting was in progress. A witness friendly to the defendant, who saw at least a portion of the affray, was not present at the trial, although he had been subpoenaed to be present.

The defendant's story of the shooting was, in part, as follows:

"Q. Now then, what happened? A. Steve made for his gun and commenced shooting, and mine happened to be sitting right there by the post, and we both went to shooting.

"Q. Did you see that gun? A. Yes, sir.

"Q. Where was it when you first saw it? A. It was in his hand. He had it in his bosom.

"Q. He got the gun from his bosom? A. Yes, sir.

"Q. And in what hand did he hold it? A. In his right hand.

"Q. In his right hand? A. Yes, sir.

"Q. When did you get your gun? A. Well, when he started after his, I started for mine.

"Q. Did you see that gun before you fired? A. Yes, sir.

"Q. You did fire? A. Yes, sir.

"Q. Do you know how many times? A. Well, it was either five or six times.

"Q. Several times? A. Yes, sir.

"Q. What sort of gun was it, pump or automatic? A. Thirty-two, twenty Winchester.

"Q. How did it discharge the shells? A. All you had to do was work it.

"Q. Work the trigger? A. No, pull the lever.

"Q. It was a pump gun? A. I reckon you would call it a pump gun.

"Q. When did you cease firing? A. Well, after I shot four or five times. I couldn't say just exactly.

"Q. Were those shots fired rapidly? A. Pretty rapidly, yes.

"Q. What did he do? A. He shot three or four times.

"Q. Did you cease firing before or after he did? A. I believe I ceased firing first."

Defendant's wife testified:

"Q. Just tell what you saw. Tell the jury what you saw. A. Well, I couldn't hear the shots fired. I could not see any gun at the buggy. In fact, I could not see any one at the buggy, but I could see some smoke coming from the buggy, and I could see Mr. Crain shooting.

"Q. Now, could you distinguish any difference in the reports, or was there any difference in the reports that you heard? A. Yes, I could tell that there were two guns shooting. I could see smoke for one reason, from the buggy. I knew that shooting was going on on both sides, but still I didn't see any gun."

This affray was the culmination of an attempt by defendant to impound or hold a team of horses belonging to a relative of the prosecuting witness who the defendant claims shot a mule belonging to defendant. These horses were being held by defendant to indemnify him for the damage done to the mule. The prosecuting witness, at the request of the owner of the horses, two days prior to the shooting demanded possession of these horses and was abusively ordered off the premises of the defendant.

A part of the information in this case is as follows:

"O. E. Crain did then and there unlawfully, feloniously and of his malice aforethought and without authority of law, and without justifiable or excusable cause therefor, intentionally and wrongfully, make and commit an assault upon and shoot at one Steve Jordan, Sr., with a certain loaded rifle, with the unlawful and felonious intent to kill him, the said Steve Jordan, Sr., with said loaded rifle aforesaid, which loaded rifle the said O. E. Crain then and there had and held in his hands, said loaded rifle being then and there a deadly weapon."

The information indicates that this prosecution was predicated upon section 1756, Comp. Stat. 1921, which is as follows:

"Any person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of firearm, airgun or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death or in resisting

the execution of any legal process, is punishable by imprisonment in the penitentiary not exceeding ten years.''

There is another section defining an assault with a deadly weapon, section 1764, Comp. Stat. 1921, which is as follows:

''Any person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots or attempts to shoot at another, with any kind of firearm or airgun, or other means whatever, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in the county jail not exceeding one year.''

The court instructed the jury defining the offense charged, as follows:

''You are instructed that the information in this case includes the offense of intentionally and wrongfully shooting at another with a firearm with intent to kill, and also an assault and battery upon another by means of a deadly weapon, and also the offense of shooting at, or attempting to shoot at, another with a firearm with intent to injure such person and without justifiable or excusable cause, although without intent to kill such person.

''If under the evidence and these instructions, you believe and find beyond a reasonable doubt that the defendant is guilty of unlawfully, feloniously, and with malice aforethought, shooting at or shooting the said Steve Jordan, with unlawful and felonious intent then and there to kill him, the said Steve Jordan, Sr., or of the offense of unlawfully, willfully, and intentionally and feloniously making an assault in and upon the said Steve Jordan, Sr., with a certain loaded rifle, the same being a deadly weapon, but you have a reasonable doubt as to which of said offenses he is guilty of, you must give him the benefit of such doubt and find him

guilty of the last mentioned offense. If you find and believe from the evidence beyond a reasonable doubt that the defendant is guilty of the offense of unlawfully, willfully, and feloniously making an assault upon and in the said Steve Jordan, Sr., with a certain loaded rifle with intent to kill and murder him, or of an assault committed with a dangerous weapon with the intent to do bodily harm, without justifiable or excusable cause, but you have a reasonable doubt as to which of said offenses he is guilty of, you must give him the benefit of such doubt and find him guilty of the offense last mentioned. If you do not find him guilty of either of said offenses, you will acquit him and return a verdict of not guilty.''

These instructions, considered together, fairly state the law applicable to the facts shown. The punishment inflicted was the minimum that could have been assessed under any reasonable deductions based on the evidence and supporting the information under which the accused was tried.

The instruction given as to the law of self-defense, although not so clear as it might have been made, was not misleading.

At the close of all the testimony the county attorney took the witness stand and testified in rebuttal as follows:

''My name is M. H. Mills. I am county attorney of this county and was such county attorney about the time this trouble occurred and after it occurred. The day the trouble occurred, or the next day, Mr. Crain, the defendant, came to Mangum and talked to me and detailed to me what he claimed were the facts concerning this trouble. He stated in that conversation that the negro was shooting at him.

''Mr. Edwards: Just a moment, if the court 'please. We object to this manner of testifying for the reason that it is not proper impeaching testimony, no proper foundation having been laid for the introduction of this testimony. No question asked the witness.

"The Court: Overruled.

"Mr. Stewart: Exception.

(Continuing) "Mr. Crain detailed to me what he claimed were the facts concerning the trouble. He stated to me that the negro was shooting at him, and that at the time or about the time the negro commenced to shoot at him he reached for his Winchester and returned the fire and shot the negro several times. Mr. Crain stated in that conversation that he did the shooting with a rifle of some kind, Winchester or Field, and stated that he was standing near these barrels, and that his gun was sitting by the barrels when the negroes drove up, and that he reached down when he saw the negro was going to shoot. He reached down and got the gun and returned the fire. Mr. Crain told me in that conversation that day that he and Bishop Goosby and old Steve were the only ones present except his wife, who he said saw the trouble. He stated that as far as he knew there were no other parties knew anything about the actual shooting. On the next day, or I could be wrong, it might have been the second day or might have been the third day afterwards, Mr. Crain came again to my office or to the county attorney's office and talked to me about this trouble. He stated in that conversation practically what he had told me before on the previous day and stated that Mr. W. E. Kelly was also present and saw all the shooting; that Mr. Kelly was behind the barn. I think he said he came to borrow something or return something that he had borrowed, I am not sure which, and that he was there horseback and that he saw it all. And that is all."

Cross-examination: "Q. How many conversations did you have with Mr. Crain? A. Mr. Stewart, Mr. Crain has visited me at my office 15 or 20 times since this suit was filed.

"Q. Kelly has visited you, hasn't he? A. He came shortly after Mr. Crain came the second time about which he has testified, and I wouldn't say that he hasn't been there again. Perhaps he has, Lige, but I'm not sure about that.

"Q. That is all."

An examination of the testimony given by the defendant discloses that this was in no sense rebuttal of any specific facts stated by the accused. It was an attempt to impeach the defendant on the ground of having made contrary or conflicting statements, at variance with the story he related in his testimony in chief. No sufficient foundation was laid for the introduction of this impeaching testimony. This was error, but since no exceptions were saved to the latter part of the county attorney's narrative statement, the error may be considered as waived. Although the reception of this testimony was improper, or at least irregular, the defendant made no denial of the truth of the statements of the county attorney and no showing that he was surprised or unable to controvert the statements made. The purpose of first laying a foundation for impeachment, under circumstances like these, is to give the witness notice of the alleged discrepancies in his statements in order that he may refresh his memory and, if possible, make explanations or offer other proof. The defendant here intimated no such desire, and we hold that this error under all the circumstances was harmless.

The evidence all indicated that there was no element of self-defense, excepting only the testimony of the defendant and his wife, whose statements were of a self-serving character and contrary to the physical facts proved. The other testimony is convincing that Steve Jordan had no gun and made no hostile demonstration whatever. Under all the evidence the defendant may consider himself fortunate that he was not convicted of an assault with intent to kill, coupled with a much more severe penalty.

MATSON, P. J., and DOYLE, J., concur.