**H. F. WILCOX OIL & GAS CO.**
**v. DIFFIE et al.**

**H. F. WILCOX OIL & GAS CO.**
**v. CARPENTER et al.**

**H. F. WILCOX OIL & GAS CO.**
**v. McINNIS.**

Nos. 4021–4023.

United States Court of Appeals
Tenth Circuit.

Dec. 20, 1950.

684

Garrett Logan, Tulsa, Okl. (Villard Martin and Horace B. Clay, Tulsa, Okl., on the brief), for appellant.

O. C. Essman and R. D. Hudson, Tulsa, Okl., for appellees.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

In No. 4021, Diffie and Greene, owners of 15/32nds of the working interest under an oil and gas lease, recovered a judgment against H. F. Wilcox Oil and Gas Company,[1] the owner of 17/32nds of the working interest, for $161,698.60, on account of oil produced from the lease by Wilcox and not accounted for by it. The oil well on such lease was known as the Diffie well.

In No. 4022, Glover and the other appellees,[2] who were part owners of royalty and overriding royalty interests under an oil and gas lease acquired by Wilcox subject to such royalties, recovered a judgment against Wilcox for $16,928.90, on account of oil produced from such lease by Wilcox and not accounted for to such royalty owners. The oil well on such lease was known as the Martin well.

In No. 4021 and No. 4022 the actions were for conversion of oil.

In No. 4023, McInnis recovered a judgment against Wilcox cancelling an assignment dated January 9, 1933, running from McInnis to Wilcox, and assigning to Wilcox, McInnis' undivided 1/4 interest in an oil and gas lease known as the Simon-McInnis lease, and ordering an accounting to McInnis by Wilcox. The oil well on that lease was known as the Simon-McInnis well.

From such judgments, Wilcox has appealed.

All such leases covered land situate in Oklahoma County, Oklahoma and in the Oklahoma City oil field.

---

1. Hereinafter called Wilcox.

2. Glover died March 23, 1949. Prior to her death, she transferred her claim to Mary C. Carpenter, and the cause of action was revived, and an order was entered in this court substituting Carpenter for Glover.

In No. 4021 a hearing was had before the trial judge on June 7, 1944. Certain witnesses were heard and depositions of Alfred F. Johnston taken in March, 1944, in No. 4021 and No. 4022 were introduced in evidence. Thereafter, an order was entered consolidating No. 4021 and No. 4022, and a further hearing was had before the trial judge on March 14, 1945, in the consolidated cases. Thereafter, the three cases were consolidated and referred to a special master.

During the years 1931 to 1936, inclusive, Wilcox owned interests in 15 wells in the Oklahoma City field, including the three wells mentioned above. In certain of the wells it owned the entire working interest and in the others it owned a portion of the working interest. During the whole of such period, it operated seven of such wells, including the Diffie and Simon-McInnis wells. During the period from its completion to April, 1932, Wilcox operated the Martin well; from May to December 31, 1932, the Marshall Oil Company operated such well; and from January 1, 1933, through 1936, Wilcox operated such well. During the whole of such period, one well, the Butcher, was operated by the Marshall Oil Company. From the dates of their respective completions to November 17, 1932, the Gibbons and Bisbee wells were operated by the Morgan Petroleum Company. From November 18, 1932, to October 25, 1933, Wilcox operated such wells for E. D. Davis, receiver of the Morgan Company, and from October 26, 1933, such wells were operated by Wilcox. The Buxton and Keller wells, from the dates of their respective completions to December 31, 1932, were operated by the Marshall Oil Company and from January 1, 1933, through 1936, by Wilcox. The Rinehart-Donovan well was operated from September, 1931, through April, 1935, by Wilcox. During the periods prior to September, 1931, and subsequent to April, 1935, it was operated by others. The Jameson-Grimes well was operated from the time of its completion to August 5, 1935, by Wilcox, and from August 6, 1935, through 1936, by the Jameson-Grimes Company.

All of the 15 wells were completed during 1931. The Diffie well was completed July 18, 1931. The Martin well was completed in August, 1931, and the Simon-McInnis well was completed in May, 1931.

At the beginning, Wilcox had a gathering line and a small receiving tank connected to the stock tanks on each lease. Later, Wilcox built a tank farm called the Dolliver Tank Farm, consisting of a number of 55,000-barrel tanks and two 5,000-barrel tanks. It also constructed a loading rack on the Frisco Railroad.

### 1. The Appeals in No. 4021 and No. 4022

Prior to the completion of such wells in 1931, and continuing to about July 1, 1933, the Oklahoma Corporation Commission[3] undertook to issue orders limiting the quantity of oil that could be produced from each well in the Oklahoma City field and fixing a daily allowable for each of such wells.

From early in 1931 until about December 1, 1934, Albert F. Johnston was district superintendent of Wilcox's operations in the Oklahoma City field. Under instructions from H. F. Wilcox, president, and G. A. Dye, executive vice-president, Johnston produced from the 15 wells all of the oil he could in excess of the allowables fixed by the orders of the Commission until July 1, 1933. Thereafter, new allowables fixed by orders of the Commission under a new conservation statute enacted in 1933 were in effect. The earlier orders were held void by the Supreme Court of Oklahoma in H. F. Wilcox Gas & Oil Co. v. Walker, 168 Okl. 355, 32 P.2d 1044, decided May 8, 1934.[4]

When oil was produced from the wells, it was received in lease stock tanks. Before the oil was run from such tanks it was gauged and a gauge ticket was made

3. Hereinafter called the Commission.

4. See, also, H. F. Wilcox Oil & Gas Co. v. Walker, 169 Okl. 33, 35 P.2d 893, holding that Wilcox was not guilty of contempt in refusing to obey such earlier orders.

out. No oil went into the gathering lines or storage tanks of Wilcox until it had been gauged in the proper manner. Ordinarily these tickets were made out by the gauger, Lonnie Brumfield. Occasionally, they were made out by Lum Coleman or by Johnston.

Under orders from Wilcox, Johnston sent the gauge tickets covering the oil produced in accordance with the void orders to Wilcox's production department at Tulsa, Oklahoma, and sent the gauge tickets covering the oil produced in excess of such orders to H. F. Wilcox.

To aid it in concealing the production in excess of such void orders, Wilcox, on January 14, 1932, organized its wholly-owned subsidiary, Titan Oil Company,[5] a Delaware Corporation. However, it began crediting excess oil to Titan on its books, hereinafter referred to, before the incorporation of Titan. In December, 1931, H. F. Wilcox placed C. L. Miller in charge of keeping a separate set of books and records reflecting the production of excess oil and delivered to Miller gauge tickets he had theretofore received for excess oil theretofore run. Miller set up a separate set of books for Titan, consisting of a cash book, a journal, and a general ledger.

Miller first made up work sheets from the gauge tickets. They consisted of the following:

(1) A separate sheet for each lease for each month. Gauge tickets for excess oil from that lease were posted to that sheet. It showed the date of each gauge ticket, the tank number, gravity of the oil, and amount of oil in barrels, and the total barrels for the month, and other accounting information, including the amount due each of the owners of the oil and royalty owners.[6]

(2) A summary sheet for each month covering all 15 leases showing total production from each lease and the total amount of excess oil produced from all the leases for the month.

(3) A sheet showing total production for the month from each lease, including allowable and excess oil and its disposition.

These work sheets for the month of November, 1931, were introduced in evidence. Sheet (1) showed a total of 15,184.82 barrels from the Diffie well. Sheet (2) showed the total production of excess oil for November to be 208,030.39 barrels. Sheet (3) showed the total production, both allowable and excess, of 368,880.56 barrels, and it showed the disposition of the excess oil, 208,030.39 barrels, to Titan.

When the Titan books were set up, Miller began entering on such books as a charge to crude oil purchases, the excess oil theretofore run as reflected by the gauge tickets and his work sheets. Excess oil charged to Titan was also reflected on the books of Wilcox by entries currently made in intercompany accounts. Titan's books also reflected the disposition of such oil and the proceeds received from sales thereof. For a time, Miller was behind on the posting of the entries on the Titan books, but by March, 1932, he had caught up, and thereafter the facts reflected by gauge tickets for the excess oil were currently posted on Titan's books.

The amount of excess oil recorded on Titan's books was as follows:

| | | |
|---|---|---|
| November, 1931 | 208,030.39 | barrels |
| December, 1931 | 199,104.91 | " |
| January, 1932 | 218,002.80 | " |
| February, 1932 | 215,277.80 | " |
| March, 1932 | 531,503.98 | " |
| April, 1932 | 260,453.86 | " |
| May, 1932 | 14,356.82 | " |

The aggregate was 1,646,820.56 barrels. The net, after a three per cent deduction for "strapping," was 1,571,371.47 barrels. The Commission discovered the existence of Titan in May, 1932. From May 31, 1932, until December, 1932, all production was entered in Wilcox's books as regular production. In December, 1932, Wilcox again started overproducing and the overproduction was entered by Miller on

---

5. Hereinafter called Titan.

6. Copies of sheet one were sent to such owners.

the books of Donald W. Spitzer. The amount of excess oil so entered to the credit of Spitzer for December, 1932, and the first four months of 1933 was 535,-508.75 barrels.

After necessity for concealment had ceased, the entries with respect to excess oil theretofore reflected only on the books of Titan and Spitzer, were consolidated with the entries as to other oil produced from such leases in the books and records of Wilcox, so that the latter books then reflected all of the oil produced from such leases as shown by the gauge tickets, the books and records of Titan and Spitzer, and Wilcox's own books and records.

After Miller was placed in charge of keeping the records of the excess oil, gauge tickets, when and as received, were delivered to him by H. F. Wilcox, Dye, M. P. Appleby,[7] or the mail clerk, and thereupon Miller currently entered such gauge tickets on the work sheets, and then on Titan's books to the credit of Titan, and later, on Spitzer's books to the credit of Spitzer. Sometimes the gauge tickets for excess oil were delivered to Miller in the envelope in which they were received, without it having been opened.

Wilcox produced its own books, Titan's books, and Spitzer's books. It also produced gauge tickets covering all of the oil run from such leases as shown on the books and records of Titan, Spitzer, and Wilcox, and later, on the consolidated record of Wilcox. All of such gauge tickets reflected the oil as being run to the credit of Wilcox and none to the credit of either Titan or Spitzer. It also produced divi-sion orders, contracts, statements, vouchers, and checks which corroborated the accuracy of its book entries.

After the first accumulation of gauge tickets was delivered to Miller by H. F. Wilcox, the gauge tickets were delivered to Miller promptly as received, and he currently entered them on his work sheets, on Titan's books, or on Spitzer's books. After he posted the gauge tickets, he filed them in a suitcase which was kept in a locker in H. F. Wilcox's office. Both Appleby and Miller had access to the suitcase. There was evidence that the early tickets covering excess oil were stored in a safe in the office of H. F. Wilcox. Appleby had access to such safe. At times, when fear of inspection and discovery arose, the gauge tickets filed in the suitcase were temporarily removed from Tulsa, but were thereafter returned and again placed in the locker in H. F. Wilcox's office. A key to the locker was kept in H. F. Wilcox's desk and was available to Miller.

Miller produced a summary, identified as Wilcox Exhibit 70, based on the Titan books and records, the Spitzer books and records, and the Wilcox books and records, and consolidated into the latter, showing the oil run from each of the 15 wells during each month of the period from March 1, 1931, to December 31, 1936, which, computed on the basis of 97 per cent, because of a three per cent deduction for dirt, sediment, and pipe line losses,[8] aggregated 6,770,023.88 barrels; on a 100 per cent basis the aggregate was 6,979,406.06 barrels. On the 97 per cent basis, the total

7. Appleby was a vice-president of Wilcox.

8. "In the marketing of crude oil, it is the practice to run the production from the well into settling tanks and permit the heavier ingredients, constituting impurities, to settle to the bottom. The part that is not thus settled off is run into the pipe line. This practice removes a part, but not all, of the impurities and to compensate for such impurities and pipe line losses, provision is made in the division orders for deduction of a stipulated percentage.

"This practice or usage of deducting three per cent on account of dirt and sediment and transportation losses had its inception in Pennsylvania. During the time that oil has been produced in Oklahoma and in its neighboring state of Kansas, it has been the uniform practice and usage to incorporate in division orders a provision for the deduction of three per cent of the oil received into the pipe lines on account of dirt and sediment. This deduction is to cover not only impurities in the oil, but also shrinkage or loss during transportation. Like deductions are made in other areas." United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194, 199.

production from the Diffie lease was 448,-638.02 barrels; from the Martin lease, 251,756.79 barrels; and from the Simon-McInnis lease, 724,358.39 barrels. Pipe line division orders are made on a 97 per cent basis.

The correctness of such summary is supported by the gauge tickets and the books and records of Titan, Spitzer, and Wilcox.

Johnston testified that all of the oil delivered out of the tank farm was charged out by ticket; and that all oil delivered through the loading rack was charged in and out of the tank farm; and that all oil delivered by tank car shipment or otherwise, even though it did not actually go into the tank farm, was credited to and charged against the tank farm.

The correctness of the amount of oil produced and run monthly as reflected by the gauge tickets and the books and records made therefrom was checked by monthly inventories of the tank farm. A computation was made of the amount of oil that went into the tanks during the month, to which was added the amount of oil shown at the beginning of the month by the previous inventory. From this was deducted the amount sold and run from the tanks. This was compared with the final gauge of the tanks at the end of the month. Excess oil was credited to Titan for the last two months of 1931 and the first five months of 1932. A summary of such inventories was introduced by Wilcox for the last two months of 1931 and the first five months of 1932. In such months the inventory showed a nonsubstantial shortage, except the inventory for the month of March, which showed an overage of 78,342.39 barrels, which indicated that a substantial number of the gauge tickets had not been received. An investigation was made and it was discovered that most of the overage resulted from the failure of the Marshall Oil Company to turn in gauge tickets for leases operated by it. Miller obtained some of these gauge tickets from the Marshall Oil Company and eventually gauge tickets were turned in which cleared up the discrepancy. Whenever there was a substantial overage in the tanks, an investigation was made to determine where the error was, and obtain any withheld gauge tickets. Since all of the oil run to the tank farm from the leases and all oil delivered from the leases through the loading rack and shipped by tank car or otherwise, even though it did not actually go into the tank farm, was credited to and charged against the tank farm, the monthly inventories embraced all of the oil produced and run from the leases. Therefore, the monthly inventory check strongly corroborated the fact that Miller received gauge tickets for all of the excess oil run from the leases and posted the amount of excess oil reflected by such gauge tickets on the books of Titan, Spitzer, and later, by consolidation with the allowable oil records, on the books of Wilcox.

The books and records of Wilcox showed in detail all of the oil purchased by Wilcox in the Oklahoma City field from other producers,[9] all the oil produced from each of the leases in the Oklahoma City field during the period from March 1, 1931, to December 31, 1936, and the disposition of all the oil purchased and produced by Wilcox in the Oklahoma City field. They reflect the following:

| | |
|---|---|
| Total oil runs from the leases | 6,979,406.06 barrels |
| Total oil purchased from other producers in the Oklahoma City field | 294,592.70 " |

or an aggregate of 7,273,998.76 barrels. They further show sales made directly from leases, 782,669.20 barrels, total sales from gathering system, 530,973.95 barrels, and all others sales, 6,008,520.58 barrels, or total dispositions of 7,322,163.-73 barrels.[10]

---

9. Entries in the books as to oil purchased by Wilcox were supported by contracts and other documents and were made available for inspection by counsel for plaintiffs below.

10. The excess of disposition under leases of approximately 48,000 barrels, or about 2/3 of one per cent, is a minor discrepancy.

All of such oil was sold by Wilcox in its name. In one instance, however, the sales tickets were changed to show Titan as the seller to Magnolia and Titan was paid for some oil on written authority from Wilcox. Johnston testified that all Titan oil was run to the Dolliver Tank Farm and when sold was delivered under the name of Wilcox, except as to one sale, where the sales tickets were changed to show Titan as the seller. The records of major purchasing companies during the period involved were introduced. They reflected purchases from Wilcox which fully corroborated and supported the accuracy of Wilcox's records with respect to 85% of the oil sold. The books and records of some of the small purchasers were not introduced, because not available.

The correctness of the book entries of sales was supported by run tickets, contracts and division orders.

Johnston named the pipe line companies through which oil produced in the Oklahoma City field was transported. The records of these companies were produced and they also corroborated and supported Wilcox's records with respect to disposition of oil produced from the 15 wells.

Johnston testified that all oil shipped by tank car through the loading rack, whether it went into the Dolliver Tank Farm or not, was charged to and credited to the tank farm, and that bills of lading on all shipments of oil shipped by tank car were forwarded by him to the accounting department of Wilcox at Tulsa. Johnston further testified that Titan neither purchased nor received any oil direct from any of the lessees and that all of the oil purchased by Titan was oil that passed through the Dolliver Tank Farm. Appleby also testified that every barrel of oil purchased by Titan came out of the tank farm and there was never a direct sale of oil to Titan.

The records of Wilcox show that there were shipped from the loading rack by tank car to its Bristow Refinery in 1931, 191,160.01 barrels; in 1932, 279,149.24 barrels; and in 1933, 105,727.54 barrels, or an aggregate of 576,036.79 barrels of oil.

Counsel for appellees requested Wilcox to make available to them their original records reflecting shipments of oil from the loading rack by tank cars during the period here involved, including the records from which the amounts of oil shipped to the Bristow Refinery in 1931, 1932, and 1933, were computed. Counsel for Wilcox complied with that request and offered to assist counsel for appellees, or their agents, in the examination of such records. The records made available included bills of lading, contracts of sale, vouchers, and other like data. As a result of the examination of the records referred to, appellees introduced in evidence an exhibit which was a summary of bills of lading of tank-car shipments from Oklahoma City to Bristow from Titan, consigned to Titan, aggregating 116,850.38 barrels. The bills of lading showed such shipments were made in April, 1932. The transactions were reflected upon the books of both Wilcox and Titan and in addition they were reflected in the records of shipments to the Bristow Refinery in 1932, carried into the aggregate amount of oil shipped to the refinery that year. The capacity of the refinery was 5,000 barrels a day and it had storage capacity of approximately 305,000 barrels. The assertion of counsel for appellees that the refinery, with a daily capacity of 5,000 barrels, would have processed more than 576,000 barrels of oil in three years wholly fails to take into consideration other material facts disclosed by the records. During each month from September, 1932, to December, 1933, both inclusive, Mid-Continent Petroleum Company delivered to the Bristow Refinery substantial quantities of oil, aggregating during the period, 1,117,766 barrels. On July 11, 1931, Tidal Refining Company contracted to deliver to the Bristow Refinery, 250,000 barrels of oil, to be delivered at the rate of approximately 3,000 barrels per day, deliveries to commence five days after the date of the contract. On November 18, 1931, Tidal Refining Company entered into a contract with Wilcox to deliver 100,000 barrels of oil into storage adjacent to and connected

with the Bristow Refinery, at the rate of approximately 3,000 barrels per day, deliveries to commence November 13, 1931.

Between November 18, 1931, and February 2, 1933, Wilcox entered into four like contracts for the sale and delivery to it of stipulated quantities of oil aggregating 500,000 barrels. Two of such contracts were entered into with the Tidal Refining Company and two with the Tidewater Oil Company. Three of them provided that the oil should be delivered into storage adjacent to and connected with the Bristow Refinery. The other provided that the oil should be delivered at the Bristow Refinery. Deliveries were to be at the rate of approximately 3,000 barrels per day.

The foregoing sufficiently shows that it was the practice of Wilcox to purchase substantial quantities of oil from other producers for processing at its Bristow Refinery. Moreover, during the years 1934, 1935, and 1936, Wilcox shipped no oil produced by it from the 15 wells to the Bristow Refinery, but obtained all of its oil for such refinery from other sources.

When the evidence with respect to shipments to the Bristow Refinery is considered in its totality, it does not reasonably permit of any inference adverse to Wilcox.

The books and records of Titan, Spitzer, and Wilcox show a production from the Diffie well during the period from July, 1931, to July 1, 1933, of 337,665.44 barrels, and such books and records show a production from the Martin well from August, 1931, to July, 1933, of 199,570.89 barrels. It is undisputed, and in fact it is conceded, that Wilcox duly accounted to the plaintiffs below, in No. 4021, for their share of the oil produced from the Diffie well, as shown by the books and records of Titan, Spitzer, and Wilcox and fully paid them the amounts due them for their share of such oil, and that Wilcox duly accounted to the plaintiffs below, in No. 4022, for the oil produced from the Martin well, as shown by such books and records and fully paid the amounts due them for royalties from such oil.

To establish that additional oil was produced from the Diffie, Martin, and Simon-McInnis wells, plaintiffs below introduced the evidence of Johnston in which he undertook to estimate the total production from such wells from the time they were completed until July 1, 1933. Johnston's testimony was based entirely upon his own recollection and not upon any records. He left the employ of Wilcox on December 1, 1934. His testimony was embraced in depositions taken March 14, 1944, and testimony taken before the trial judge and the special master. Johnston testified that he produced from all the 15 wells from their completion to July 1, 1933, from 13,000 to 35,000 barrels per day. He stated that he did not mean that they produced that much every day, but that he estimated the average production from each of the wells per month to be 22,000 to 23,000 barrels. He said wells with a higher potential produced more excess oil than wells with a low potential, and that he allocated his estimated total average monthly production to each of the 15 wells on the basis of their respective potentials. A four-hour flow test was made of each well when completed. The potential was six times the amount of oil produced on the four-hour test. Allowable production was based on potentials. At one time he testified that the potential of the Martin well was 300 to 400 barrels per hour and at another time he testified that it was 350 barrels per hour. He testified that the potential of the Diffie well was between 1,100 and 1,200 barrels per hour. He testified that on the potential test of the Simon-McInnis well it produced 6,000 barrels of oil in 3½ hours, which is a potential in excess of 1,700 barrels per hour. He stated that by allocating the aggregate average monthly production to each of the 15 wells in proportion to their potentials, he estimated the production from the Diffie well to be 25,000 barrels per month, or an aggregate of 575,000 barrels from August 1, 1931, until July 1, 1933. On the same basis he estimated the production from the Martin well to be 12,000 barrels per month, or from August, 1931, to July 1, 1933, 264,000 barrels, and that on the same basis, the production from the Simon-McInnis well was 35,000 barrels per month.

It is obvious that Johnston did not follow even approximately the formula which he stated he applied in arriving at his estimates of the production from the Diffie, Martin, and Simon-McInnis wells. If the Diffie well, with a potential of 1,150 barrels per hour, produced 575,000 barrels of oil from August 1, 1931, until July 1, 1933, the Martin well, with a potential of 350 barrels per hour, should have produced 175,000 barrels. Wilcox's records show that it credited that well with 199,570.89 barrels during such period.

Johnston testified that the Buxton well, the largest producer of the 15 wells, had a potential of 6,000 barrels. He further testified that the average monthly production of the Buxton well was 50,000 barrels. At another point he testified that in his allocation of the total monthly production to the various wells on the basis of their potential, he allocated to the Buxton well 45,000 to 50,000 barrels. Johnston testified that the potential of the Diffie well was 1,100 to 1,200 barrels, which was, therefore, approximately one-fifth of the potential of the Buxton well. One-fifth of the monthly production estimated and allocated to the Buxton well would be 10,000 barrels. Therefore, if Johnston followed his formula, the monthly production of the Diffie well would be 10,000 barrels, not 25,000 barrels.

To support his assertion that he could estimate the total monthly production from the 15 wells and allocate it to each well on the basis of its potential, Johnston testified that he was in sole charge of the operation of all 15 wells. He testified that he operated the four wells in which Marshall, and later the Marshall Oil Company, had an interest, and that Marshall had no jurisdiction over them with reference to oil being run, delivered, and gauged. Those statements were refuted by the books and records of Wilcox and the testimony of Miller. Two of the wells, the Gibbons and Bisbee, were operated from the time of completion to November 17, 1932, by Morgan Petroleum Company; from November 18, 1932, to October 25, 1933, by Wilcox for E. D. Davis, receiver; and from October 26, 1933, on, by Wilcox. The testimony of Miller as to those wells is supported by statements in a letter dated November 19, 1932, to Appleby, signed by Johnston, and which Johnston admits he wrote, and wherein Johnston stated that he was returning the notice of Wilcox taking over Gibbons and Bisbee, formerly operated by Morgan Petroleum Company, and stated that Davis was appointed receiver November 18, 1932, and that the date of the transfer from Morgan Petroleum Company to Wilcox should be November 16, rather than November 23, 1932.

After the special master's report had been submitted, Wilcox brought to the attention of the trial court a deposition given by Johnston in January, 1936, in the case of McInnis v. Wilcox Oil & Gas Company, No. 1630 Equity, pending in the United States District Court for the Western District of Oklahoma. The deposition was signed by Johnston and it recites that Johnston was produced as a witness, and having been first sworn, gave the following deposition. Johnston's attention was not called to the deposition and he was not given an opportunity to deny or explain those parts thereof which impeach his testimony in the instant cases. The deposition was duly certified here as being part of the record and proceedings in the instant cases. The Supreme Court of Oklahoma, so far as we are able to find, has not passed on the question of whether a foundation must first be laid for the introduction of evidence of prior inconsistent statements. The Oklahoma Criminal Court of Appeals, however, has held, in accordance with the weight of authority, that before such statements may be introduced, the witness' attention must be called to the prior statements and he must be afforded an opportunity to explain them or deny that he made them.[11]

There is respectable authority that the rule requiring a foundation to be laid for impeachment of a witness by proof of a

11. See Crain v. State, 24 Okl.Cr. 343, 217 P. 888; Seabolt v. State, 59 Okl.Cr. 1, 57 P.2d 278.

prior contradictory statement does not apply where the contradictory statement is contained in a duly authenticated deposition given by the witness.[12] It has also been held that a foundation need not be laid where the evidence sought to be impeached has been given by deposition.[13] Still other courts have held that whether a foundation must be laid to permit the introduction of prior contradictory statements of a witness for the purpose of impeachment is a matter resting in the sound discretion of the trial court.[14]

Of course, the reason for the majority rule is to give the witness an opportunity either to deny his contradictory statements, or, if they are ambiguous, to explain them. It is difficult to conceive that Johnston could either deny having made or explain the contradictory statements in his deposition in No. 1630 Equity. Moreover, the rule requiring a foundation to be laid is for the benefit of the witness and not the parties to the action. In State v. Carabajal, 26 N.M. 384, 193 P. 406, 407, 17 A.L.R. 1098, the court said:

"The rule is that before proof of previous statements, contrary to the present testimony of the witness, may be shown, the previous statement and the circumstances under which the statement was made, sufficient to identify the occasion, must be called to the attention of the witness. * * * The object of the requirement is to afford the witness an opportunity to deny the statement, if he did not make it, or to admit it if he did make it, and to make such explanation of the apparent contradiction as he may have. Section 5, Chamb. Mod. Law Ev., §§ 3756, 3757; 2 Wig.Ev., §§ 1025, 1035; 5 Jones, Ev. § 846.

"The protection furnished by the rule is for the benefit of the witness, not for the parties. And when, as in this case,

the appellant was permitted to show by the reporter of the habeas corpus proceedings the former statement by the witness, without foundation having been laid, it was the witness, if anybody, and not the appellant, who suffered injury."

In his deposition Johnston testified:

"Question No. 1. Mr. Johnston, you testified on Direct Examination that the H. F. Wilcox Oil & Gas Company owned and operated some sixteen (16) wells in the Oklahoma City Oil Field during the time of your supervision? (a)   Yes, sir.

"Question No. 2.   Is it not a fact that some of these wells in which the H. F. Wilcox Oil & Gas Company are interested, were not directly operated by that Company? (a)   Yes.

"Question No. 3.   Will you state whether or not the Marshall Oil Co. oil wells were operated by the H. F. Wilcox Oil & Gas Company? (a)   They are operated indirectly, in other words, cooperatively managed.

"Question No. 4.   Who directly operated the Marshall well? (a)   For a time by Henry Marshall.

"Question No. 5.   And the Marshall Oil Company? (a)   Yes, sir.

"Question No. 6.   Who directly operated the Morgan wells? (a)   They were operated for a time by the Morgan Petroleum Company, and a part of the time by the H. F. Wilcox Oil & Gas Company."

In the instant cases, Johnston undertook to estimate the total production from the 15 wells and to allocate it to the different wells on the basis of their respective potentials. In his deposition he testified:

"I do not remember the potential test of the Simon-McInnis well, nor do I remember the actual potential test of any other well operated by the H. F. Wilcox Oil & Gas Company, but I do remember that

12.  People v. Butler, 55 Mich. 408, 21 N. W. 385; Lightfoot v. People, 16 Mich. 507, 512, 513; United States v. White, 28 Fed.Cas. p. 572, No. 16,679; Walden v. Finch, 70 Pa. 460, 463. See, also, Wigmore on Evidence, 3d Ed., Vol. III, §§ 1025–1028.

13.  Billings v. Metropolitan Life Ins. Co.,

70 Vt. 477, 41 A. 516, 517; Comstock's Adm'r v. Jacobs, 89 Vt. 133, 94 A. 497, 500.

14.  Rothrock v. Gallaher, 91 Pa. 108, 113; Rabinowitz v. Silverman, 223 Pa. 139, 72 A. 378, 380; Hedge v. Clapp, 22 Conn. 262, 267–269; Adams v. Herald Pub. Co., 82 Conn. 448, 74 A. 755, 757.

there were quite a number of wells in the Oklahoma City Oil Field that were far larger than the Simon-McInnis No. 1 operated by the H. F. Wilcox Oil & Gas Company."

"Question No. 20. Did you learn what the Simon-McInnis well came in at? (a) I do not remember the initial four hour Corporation Commission test."

"Question No. 72. Do you have any way of estimating the number of barrels of oil that was produced and run from the Simon-McInnis well when you had charge? (a) I do not."

"Question No. 81. How many barrels of oil would you say, was produced, run or taken from the Simon-McInnis well, lease or leasehold estate, when you were in charge? (a) I have not the slightest idea."

At the hearing before the special master, which was commenced October 29, 1945, Johnston testified with respect to the production from the Simon-McInnis well. He fixed the potential of that well at 1,700 barrels per hour, or 35,000 barrels per day. He estimated the production from the well from the date of its completion until July 1, 1933, at 35,000 barrels per month. He stated that he was looking at a piece of paper to refresh his memory. On cross-examination, he stated that he made out the data on the piece of paper at Salt Lake City in 1943 or 1944; that he made it from his recollection of production records which he had when he resigned from Wilcox, December 1, 1934; that he did not take such production records with him; that such production records were not Wilcox's records, but his own personal records, on which he made entries each morning of the amount of oil he had produced the preceding 24 hours; and that his recollection was based on those records, which he did not have after December 1, 1934. When he gave his deposition in No. 4022 (No. 1304 below), he testified that he had no records of production other than the gauge tickets, which were sent to the home office, and that he kept no personal records of production of any kind. He reiterated that testimony several times in his depositions

and testified to the same effect before the trial judge. After July 1, 1933, production from the Simon-McInnis well was in accordance with the allowables fixed by the Commission. Johnston was asked to estimate the monthly production for such well after July 1, 1933. He gave a minimum and maximum estimate of the production per month. The actual production was from two to four times his estimate. He also made a minimum and maximum estimate of the production from the Diffie well after July 1, 1933. It was produced in accordance with the orders of the Commission. The actual production was substantially higher than his estimate.

Johnston testified that the production of excess oil was very irregular; that he might produce 6,000 barrels from a well one night, and then not produce any excess oil from such well for five days. Dye testified that they were shut down from time to time; that on occasions they were shut down for periods of two days to a week; and that on two occasions they were shut down for 30 days. The difficulty, if not the impossibility, of Johnston testifying with any degree of accuracy from memory as to the production from such wells is obvious.

Being confronted with the gauge tickets and the evidence that Wilcox had accounted for all of the oil shown by the gauge tickets at the hearing before Judge Vaught, Johnston testified that he ran thousands of barrels of oil to the credit of Titan and to the credit of Spitzer. Dye, notwithstanding he had theretofore testified that he did not examine the gauge tickets, testified that he examined some gauge tickets for excess oil from time to time at the Wilcox offices and that some of them showed oil run to the credit of Titan, but that he was not sure that any tickets showed oil run to the credit of Spitzer.

Brumfield, the regular gauger, testified that all the gauge tickets were made out to the credit of Wilcox and none showed oil run for the credit of either Titan or Spitzer, and that all of the oil was run to the credit of Wilcox under the instructions of Johnston.

Appleby testified that he never saw any gauge ticket for oil run from the field to the credit of either Titan or Spitzer; that there were tickets on oil run from the storage tanks, as distinguished from the field, made out to Titan.

Miller testified that he saw no gauge ticket showing oil run to the credit of either Titan or Spitzer.

It was the practice of Miller, after he had entered excess oil to the credit of Spitzer on the Spitzer books, to send the gauge tickets therefor to Spitzer, at Toledo, Ohio, and for Spitzer thereafter to return the tickets to Wilcox at Tulsa. Spitzer testified that he had no recollection of any of such tickets showing oil run to his credit; that they showed oil run to the credit of Wilcox.

The evidence clearly established, and Johnston admitted, that many of the gauge tickets covering excess oil showed the oil run to the credit of Wilcox. There could be no possible reason for making out tickets showing part of the excess oil run to the credit of Titan and Spitzer and part of the excess oil run to the credit of Wilcox, particularly since gauge tickets covering excess oil were to be concealed. Moreover, Johnston did not testify that he received any instructions to show on the gauge tickets that oil was run to the credit of either Titan or Spitzer. Finally, it would have been physically impossible under the method of segregating the gauge tickets as between allowable oil and excess oil, for the gaugers to make out the tickets covering the excess oil to the credit of Titan or Spitzer. The gaugers made no distinction between allowable and excess oil. They made out gauge tickets covering all of the oil, both allowable and excess, and delivered them to Johnston. Johnston testified that he did not fill in the tickets; that he merely initialed some of them. He further testified that after he received from the gauger all of the tickets covering both allowable and excess oil, he segregated sufficient gauge tickets to cover the allowable oil and mailed those directly to the accounting department of Wilcox, and mailed the balance of the tickets covering excess oil directly to H. F. Wilcox.

Johnston testified that all of the oil which he ran to the credit of Titan and Spitzer was delivered to the Dolliver Tank Farm; that no oil was run to the credit of Titan from the loading rack, and that all of the oil delivered out of the Dolliver Tank Farm was delivered under the name of Wilcox, with one exception, when a gauge ticket from the tank farm, first made out to Wilcox, was changed to Titan. It follows, if a large quantity of oil in addition to the oil reflected on the books of Titan and Wilcox was run to the credit of Titan and Spitzer and delivered to the tank farm and thereafter sold, with one exception, in the name of Wilcox, that such excess oil would have been reflected in the monthly inventories taken of the tank farm. The fact is, no substantial amount of excess oil, not reflected on the books and records of Titan, Spitzer and Wilcox, was shown by the monthly inventories.

The testimony of Johnston and Dye may be explained by the fact that a substantial number of gauge ticket forms were used which had "The Titan Oil Company" printed at the top, but on which the oil was run to the credit of Wilcox. These tickets appeared among the tickets produced by Wilcox at the trial.

It is obvious from his long-delayed report[15] that the special master, in making his findings and computations in No. 4021 and No. 4022, was confused and labored under misconceptions with respect to the true facts reflected by the record.

The master found that the total production from the Diffie well from the date of its completion to July 15, 1933, was not less than 575,000 barrels. The books and records of Wilcox showed a production during that period of 337,665.44 barrels. On the basis of those two figures, the total amount unaccounted for would be 237,334.-56 barrels, and the amount of the $\frac{7}{8}$ work-

---

15. The report was not filed until two years and ten months after the hearing before the special master.

ing interest unaccounted for would be 207,-667.74 barrels. The master found the amount unaccounted for to be 261,487.70 barrels. In arriving at that amount, the master, in those months and parts of months in which the books and records of Wilcox reflected a production in excess of 25,000 barrels per month, charged Wilcox with the amount reflected on its books, and in those months in which the books and records of Wilcox showed a production of less than 25,000 barrels per month, charged Wilcox on the basis of 25,000 barrels per month. Johnston estimated the average monthly production from the Diffie well to be 25,000 barrels. He arrived at it by estimating the average monthly production from all of the 15 wells and then allocating such average monthly production to each well on the basis of its potential. The testimony of Johnston shows indubitably that his estimate was an average monthly figure and not a minimum monthly figure. The error amounted to 24,153.14 barrels.

The master found that Diffie and Greene were entitled to recover the market value of 228,801.74 barrels, or $152,834.26, which was the value of the entire working interest, instead of Diffie and Greene's 15/32nds thereof. The trial court corrected the latter error, but did not correct the 24,153.14 barrels error.

Johnston was in charge of the wells from July 1, to July 15, 1933. He testified during that period no oil in excess of the allowable fixed by the Commission was produced. His estimate of 25,000 barrels average production from the Diffie well was for a period ending July 1, 1933, yet the master charged Wilcox with failing to account for 4,830.35 barrels for the period from July 1, to July 15, 1933, arrived at by deducting from 12,500 barrels, 7,669.65 barrels, shown as the production by the records of Wilcox.

In No. 4022, Johnston estimated the average monthly production from the Martin well to be 12,000 barrels. The master charged Wilcox on the basis of that estimate for months and fractions of months where the records of Wilcox reflected a production of less than 12,000 barrels per

month, and charged Wilcox with the production as shown by its records for months which reflected a production in excess of 12,000 barrels per month, and thus arrived at the total production from the Martin well from the date of its completion to July 15, 1933, to be 347,231.09 barrels. The records of Wilcox reflected a production for that period of 199,570.89 barrels. The master computed the 1/8 royalty on the actual production to be 43,403.88 barrels and the 1/8 royalty on the production reflected by the records of Wilcox to be 24,946.37 barrels, and concluded that Glover and the other appellees in No. 4022 were entitled to recover for 18,457.50 barrels of oil.

In the months of February, March and April of 1932, the records of Wilcox reflected a total production from the Martin well of 118,128.95 barrels. The master therefore charged Wilcox for those months with 82,128.95 barrels in excess of the average production testified to by Johnston.

The master found that the records of Wilcox for the months of March and April, 1932, showed a production of 67,-523.51 barrels. Actually, the latter figure was the amount reflected by such records for March. The amount reflected by such records for April was 32,197.81 barrels. The master further found that only 8,191.-67 barrels of such 67,523.51 barrels of oil were actually produced from the Martin well. Notwithstanding that fact, the master charged Wilcox, as stated above, with 67,523.51 barrels of oil for the month of March. If his finding is correct, he should have only charged Wilcox with the monthly average of 12,000 barrels of oil for the month of March. Therefore, even if the master's calculations on the basis of a minimum of 12,000 barrels per month could be accepted, Wilcox should have been given credit for the 55,523.51 barrels of oil on which it paid royalties to Glover and the other appellees for the month of March, 1932.

The master also charged Wilcox with 6,000 barrels of oil for the first half of July, 1933. Johnston's estimate was up to July 1, 1933, and he testified that thereafter he only produced the amount allow-

ed by the orders of the Commission, and the records of Wilcox show that no oil was produced from the Martin well during the first 15 days of July, 1933.

The trial court adopted the findings and computations of the master, except in the one particular mentioned above.

■ The findings of the master adopted by the trial court are binding on this court unless they are clearly erroneous.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." U. S. v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

■ On review of the entire evidence we have the definite and firm conviction that the findings of the special master, confirmed by the trial court, that oil was produced from the Diffie well in excess of the amount shown by the records of Wilcox, and from the Martin well in excess of the amount shown by the records of Wilcox, are clearly erroneous. In reaching that conclusion, we have not been unmindful of the rule that where the cause and existence of damages have been established with sufficient certainty, recovery will not be denied because they are difficult of ascertainment.[16]

But, we hold the principle has no application here because, in our opinion, the proof wholly failed to establish, with requisite certainty, the cause and existence of damages.

The judgments in No. 4021 and No. 4022 are reversed and the causes remanded with instructions to dismiss the actions with prejudice.

2. The Appeal in No. 4023

In his complaint in No. 4023, McInnis alleged that on January 9, 1933, for a consideration of $22,500, he transferred to Wilcox by a written assignment a ¼ interest in the Simon-McInnis lease; that

such assignment was procured by fraud and misrepresentation, in that H. F. Wilcox, as president of Wilcox, represented to McInnis that the number of barrels produced from such lease up to that time was approximately 360,000 barrels; and that McInnis had no knowledge or information of the falsity of such representations until within two years immediately preceding the commencement of the instant action. The instant action was commenced by McInnis on August 1, 1945.

The books and records of Wilcox showed that the Simon-McInnis well from the commencement of production therefrom in 1931, through December 31, 1932, produced 411,567.29 barrels of oil.

McInnis testified that shortly prior to January 9, 1933, he made inquiry of H. F. Wilcox with respect to the production from the Simon-McInnis lease; that H. F. Wilcox gave him a slip of paper showing that such production was approximately 360,000 barrels; that shortly thereafter he entered into negotiations with Dye for the sale to Wilcox of his ¼ interest in such lease; that Dye also represented to him that the production from such lease up to December 31, 1932, was about 360,000 barrels; that he consented to the running of the excess oil from the lease and understood that excess oil was run; that in 1940 or 1941 he had a conversation with Diffie; that the latter told him more oil had been run from the Simon-McInnis well than Wilcox had reported, and that he then had reason to believe that more oil had been run from the Simon-McInnis lease than H. F. Wilcox and Dye had reported to him.

On February 14, 1933, McInnis commenced an action against L. G. Simon and Wilcox in the District Court of Oklahoma County, Oklahoma, whereby he sought to have the mining partnership dissolved and accounts stated between the partners. Simon filed an answer and cross-petition therein; on October 20, 1933, Wilcox filed an answer to such cross-petition of Simon and set up in an exhibit

---

16. See Calkins v. F. W. Woolworth Co., 8 Cir., 27 F.2d 314, 320; Shannon v. Shaf-fer Oil & Refining Co., 10 Cir., 51 F.2d 878, 881–882, 78 A.L.R. 851.

attached thereto the production of oil by months from such lease from May, 1931, to and including December, 1932, aggregating 411,567.29 barrels. On October 20, 1933, Wilcox filed its answer to the petition of McInnis in that action and adopted by reference its answer to the cross-petition of Simon in such action. McInnis dismissed the action as against Wilcox on June 23, 1934, and it was dismissed as against Simon on June 16, 1934, but the action continued to pend between Simon and Wilcox on the former's cross-petition. In 1936, Shell Bassett, then an attorney for Wilcox, intending to use McInnis as a witness at the trial on Simon's cross-petition, gave McInnis a copy of the exhibit attached to the answer of Wilcox referred to above. McInnis discussed it with Wilcox's chief accountant, Eystone.

The fiduciary relationship existing between McInnis and Wilcox by virtue of the mining partnership operated by Wilcox terminated on January 9, 1933, when McInnis transferred his interest to Wilcox and Wilcox accounted to McInnis for his share of the production up to that date. Thereafter Wilcox operated the Simon-McInnis lease as its own property and not as a mining partner of McInnis. It follows that the statute of limitations began to run against McInnis January 9, 1933.[17]

■ Under the applicable statute of limitations, 12 O.S.1941 § 95, the action was barred unless brought within two years after the discovery by McInnis of the fraudulent misrepresentation. Since the instant action was commenced more than two years after the alleged fraud occurred, the burden rested on McInnis to allege and prove that he had not discovered the fraud until within the statutory period before the commencement of the action.[18]

■ "Discovery" means actual discovery, or discovery that could have been effected by the exercise of diligence.[19]

The fact that at least 411,567.29 barrels of oil had been produced from the lease up to December 31, 1932, could have been discovered by McInnis at any time by examining the books and records of Wilcox, or asking for a report thereof to him as co-owner and mining partner.

The action (No. 4021) was filed by Diffie and Greene on February 20, 1943. McInnis discussed that action with Diffie in 1941. He then had reason to believe that H. F. Wilcox and Dye had falsely stated to him the production from the Simon-McInnis lease. The pleadings in the action brought by McInnis in 1933 for an accounting showed that 411,567.29 barrels had been produced from the lease up to December 31, 1932.

Finally, McInnis did not testify positively that he had no knowledge that more than 360,000 barrels of oil had been run from the lease, or no knowledge of facts putting him on inquiry until two years prior to the commencement of his action in the instant case.

■ We conclude that the finding that McInnis commenced the instant action within two years after he discovered the fraud is not supported by substantial evi-

17. Bankers' Trust Company v. Dennis, 256 App.Div. 495, 10 N.Y.S.2d 710, 718; Kilbourne v. Kilbourne, 156 Wash. 439, 287 P. 41, 45; State ex rel. Lien v. House, 144 Ohio St. 238, 58 N.E.2d 675, 678; Siem v. Hjelm, 49 Cal.App.2d 148, 121 P.2d 87, 90; 54 C.J.S., Limitations of Actions, § 182, pp. 167, 168.

18. Micco v. Foster, 183 Okl. 89, 80 P.2d 229, 230; Martin v. Gassert, 40 Okl. 603, 139 P. 1141, 1143; Larimer v. Knoyle, 43 Kan. 338, 23 P. 487, 492; Young v. Whittenhall, 15 Kan. 579; Gulf Coast Western Oil Co. v. Trapp, 10 Cir., 174 F.2d 339, 341.

The Oklahoma statute of limitations was adopted from Kansas, subsequent to the Kansas decisions above cited. In Martin v. Gassert, supra, the court held that the Kansas decisions decided before the adoption of § 95, supra, from the Kansas statute of limitations, were controlling.

19. Mansfield, Brunsen, Kemp & Ahrens v. King, 160 Okl. 243, 16 P.2d 87, 89; Farmers' State Bank of Ada v. Keen, 66 Okl. 62, 167 P. 207, 209; Harris v. Smith, 149 Okl. 277, 300 P. 392; Bankers' Mortgage Co. v. Leisure, 172 Okl. 170, 42 P.2d 863, 864, 865; Gulf Coast Western Oil Co. v. Trapp, 10 Cir., 174 F. 2d 339, 341.

698

dence, and that, on the contrary, the evidence established that McInnis had knowledge of facts which should have put him on inquiry and that by the exercise of diligence he could have discovered that more than 360,000 barrels of oil were produced from such lease up to December 31, 1932, long prior to August 1, 1943, and that his action is barred by limitation.

The judgment is reversed, and the cause remanded, with instructions to dismiss the action with prejudice.