**Frank P. SALISBURY, Appellant,**

v.

**Arnold TIBBETTS and George Sanford, Appellees.**

**No. 5809.**

United States Court of Appeals
Tenth Circuit.

Aug. 15, 1958.

5. Cf. the provisions of Section 1718, Title 18 U.S.C.; Swearingen v. United States, 1896, 161 U.S. 446, 451, 16 S.Ct. 562, 40 L.Ed. 765.

Edward W. Clyde, Salt Lake City, Utah (J. Grant Iverson, Salt Lake City, Utah, on the brief), for appellant.

Eli A. Weston, Boise, Idaho (Fabian, Clendenin, Moffat & Mabey, Salt Lake City, Utah, on the brief), for appellees.

Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.

PHILLIPS, Circuit Judge.

Salisbury has appealed from a judgment decreeing that Tibbetts and Sanford were each entitled to acquire by purchase 600 shares of the voting stock of the Reliance National Life Insurance Company;[1] ordering Salisbury to forthwith deposit with the clerk of the court such 1,200 shares of stock; ordering that Tibbetts and Sanford might purchase such stock upon the payment of the purchase price within 30 days from the delivery thereof to the clerk; and further decreeing that in the event of the failure of Salisbury to deposit such stock with the clerk, he should pay Tibbetts and Sanford $200,000, with interest from the date of judgment.

The controversy between the parties had its genesis in the circumstances which surrounded the promotion and organization of the Reliance Company. Salisbury, immediately prior to September, 1953, was employed by the Professional & Business Men's Insurance Company[2] as an agency supervisor and he was a member of the board of directors of the Professional Company. In September, 1953, he was discharged as agency supervisor. At the time of such discharge Sanford was employed by the Professional Company and was working under Salisbury's supervision. Sanford testified that in a conversation he had shortly after such discharge, he suggested that they should organize a new life insurance company of their own and that Salisbury approved the idea. Sanford admitted there was no definite plan agreed upon, or any decision reached as to who would organize the company. Thereafter, at the request of Salisbury, Sanford contacted various insurance

---

1. Hereinafter called Reliance Company.

2. Hereinafter called Professional Company.

men in the western states in an effort to interest them in organizing a new insurance company, but with no definitive results.

Salisbury owned 550 shares of the Professional Company stock when he was discharged by that company, a portion of which he desired to sell. An arrangement was entered into between Salisbury and Sanford, whereby the latter was to sell a portion of such stock and from the proceeds realized from such sales, Salisbury was to receive $35 per share and Sanford was to retain any excess over that amount which he obtained. Sanford went to the State of Washington, where he enlisted the aid of Tibbetts in selling such stock. They sold a large portion of the stock within approximately a two-month period, at an average price of $70 per share, out of which they received $12,000. Other shares of such stock were sold through other agents, under a similar arrangement.

After further informal discussion among Salisbury, Sanford and other prospective promoters, a plan was evolved for the organization of an insurance company, with an organizational structure patterned after the Professional Company. However, no agreement was reached as to who should participate in the promotion and organization of the company.

In January, 1954, Salisbury established an office in Salt Lake City. He obtained legal counsel, arranged for reinsurance contracts with other insurance companies, and began the formation of an insurance company office staff. On January 26, 1954, Salisbury proceeded to effectuate the incorporation of the Reliance Company, with authority to issue two classes of stock, namely, 2,500 shares of voting common stock and 15,000 shares of non-voting preferred stock.

It was contemplated that the non-voting stock would be sold to the public and Salisbury obtained the necessary permits for the sale of the non-voting stock to the public in Utah, Nevada and Idaho.

On February 17, 1954, Sanford and Tibbetts arrived in Salt Lake City and went to Salisbury's office. Salisbury showed them the Reliance Company's offering circular and they became cognizant of its contents. The circular recited that of the authorized 2,500 shares of voting stock, 1,900 shares had been subscribed; that 600 shares had been issued to Salisbury; 600 shares to Edith G. Amos, Salisbury's sister; 100 shares to Ella S. Salisbury, Salisbury's wife; 200 shares each to Robert H. Petersen, Mark A. Stokes and Ray Smith, and that 600 shares remained in the treasury.

Sanford testified that he objected to the distribution which had been made of the voting stock and inquired, " * * * Where do I come in?" and Salisbury said, "Well, you don't have to worry about that. The law required me to have all the voting stock sold or I couldn't get a solicitation permit. Now, there is your solicitation permit. You don't have to worry about that. Our agreement is on. We will go out and get this job done and get the stock sold, and when we get our charter and we hold our first board of directors meeting you will be put on as the officer according to our agreement, and on the board of directors and then you can buy your stock." Sanford admitted, however, that there was no agreement as to the amount of stock that he and Tibbetts would be permitted to buy.

Sanford testified that shortly thereafter Salisbury learned that certain persons with whom he had been negotiating had decided not to join with him in developing the Reliance Company and that in the presence of Petersen and Tibbetts Salisbury stated: "Well, * * *, the four of us can do the job. The four of us will do the job and the four of us will own and run this company." Tibbetts testified to substantially the same effect. Sanford further testified it was then "I knew that it was a four-way proposition, or I thought it would be a four-way proposition." Here again, it will be observed, there was no agreement as to the amount of the voting stock each might acquire. Salisbury denied the testimony of San-

ford and Tibbetts, upon which they predicate their claim, that there was an agreement between them and Salisbury for the purchase by them of voting stock. Petersen testified that he never heard either Sanford or Tibbetts make any protest or objection to the amount of stock purchased by Salisbury or his family and in other respects Petersen fully corroborated Salisbury's testimony.

Sanford and Tibbetts engaged in the sale of the non-voting stock. They received a commission of 12½ per cent on all sales. Sanford testified that they sold 60 to 70 per cent of the non-voting stock. When the Reliance Company received $125,000 from the sale of non-voting stock, it became authorized to commence the writing of insurance.

On August 30, 1954, Sanford and Tibbetts met with Salisbury in his office in Salt Lake City. Sanford and Tibbetts demanded that Salisbury sell to each of them 600 shares of the voting stock. Salisbury refused, telling them that such a demand was ridiculous. The dispute became heated and Sanford and Tibbetts left Salisbury's office. They returned again and after further discussion Salisbury offered to sell each of them 100 shares of the voting stock at $10 per share. Sanford and Tibbetts accepted the offer. Sanford testified that Salisbury made it clear that so far as he was concerned, that was the most that either of them would receive. Sanford and Tibbetts gave promissory notes to Salisbury for the purchase price, plus some other debts that they owed Salisbury. The notes were later paid and Sanford and Tibbetts each received 100 shares of the voting stock.

Sanford and Tibbetts continued selling insurance for the Reliance Company. Further disagreements developed and in September, 1956, Salisbury discharged them as agents of the Reliance Company. They commenced the instant action February 15, 1957.

The trial court found that two oral agreements were entered into between the parties; one, to organize and incorporate an insurance company; and two, a later agreement that Salisbury would be president of the corporation; that Petersen, Sanford and Tibbetts would be on the board of directors; that "the division and ownership of the property was to be on a one-fourth basis with one-fourth interest in the voting and controlling stock of the company to be in each of the individuals present at the meeting: Tibbetts, Sanford, Salisbury and Petersen;" that contrary "to the terms of the agreement and in an effort to defraud" Sanford and Tibbetts, Salisbury "obtained control of the majority of the voting stock" and refused to comply with the terms of the agreement. The trial court then concluded, as a matter of law, that Salisbury, "contrary to the provisions of said agreement, purchased approximately 1,900 shares * * * in his own or his family's name, thereby establishing a constructive trust under which the Defendant [Salisbury] became trustee for the benefit of the Plaintiffs [Sanford and Tibbetts] for the one-fourth share each * * *"; that one-fourth interest was to be 600 shares of the voting stock; and, accordingly, entered judgment as above stated.

▮▮ We are of the opinion that the evidence and the inferences that may fairly be drawn therefrom, viewed in the light most favorable to Sanford and Tibbetts, do not support the finding of the trial court as to the second oral agreement with respect to the division of the voting stock among Sanford, Tibbetts, Petersen and Salisbury. Certainly, the evidence wholly failed to establish any understanding or agreement at any time as to any amount of the voting stock which Sanford and Tibbetts would be permitted to purchase. Therefore, one term essential to a definite and complete contract was lacking. A contract that is incomplete or indefinite in its material terms will not be specifically enforced in equity.[3]

3. Van Dyke v. Norfolk Southern R. Co., 112 Va. 835, 72 S.E. 659, 664; Pomeroy, Specific Performance of Contracts, 3d Ed., § 159.

Salisbury provided all of the initial capital. He looked after all the details of the organization and incorporation of the Reliance Company; organized an office staff; arranged for reinsurance agreements; secured necessary selling permits; and took care of the initial expenses. It is true that the services of Sanford and Tibbetts in selling a portion of Salisbury's stock in the Professional Company and a portion of the non-voting stock of the Reliance Company were important, but they were fully compensated for those services. Under the circumstances, it would seem exceedingly doubtful that Salisbury would surrender a controlling interest in the voting stock of the corporation to third persons.

 A constructive trust must be established by evidence which is clear, definite, unequivocal, and satisfactory;[4] which leaves no reasonable doubt as to the existence of the trust.[5] The evidence on the present record, far from meeting those standards, is at best slight, contradictory, and loosely circumstantial, consisting of the uncorroborated testimony of two interested parties, indefinite as to substance, imaginative as to fact and precatory as to meaning.

A careful examination of the entire evidence leaves us with the definite and firm conviction that there is no substantial basis for the court's finding that Sanford, Tibbetts and Petersen entered into an agreement on September 17, 1954, or at any time, whereby Sanford, Tibbetts and Petersen were each to receive 600 shares, or any number of shares of the voting stock, and that such finding is clearly erroneous.[6]

 Moreover, we are of the opinion that Sanford and Tibbetts are foreclosed as to their alleged claim against Salisbury by an accord and satisfaction, or a compromise of a disputed claim.

The general rule established by many of the adjudicated cases and followed in Utah is that a discharge by accord and satisfaction must rest upon a contract, express or implied, and the essentials to a valid contract generally must be present, that is, "(1) A proper subject matter, (2) competent parties, (3) an assent or meeting of the minds of the parties, and (4) a consideration."[7]

In Sullivan v. Beneficial Life Ins. Co., 91 Utah 405, 64 P.2d 351, 362, the court defined accord and satisfaction as follows:

"The definition of an 'accord and satisfaction' is: 'An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to. And a satisfaction is the execution of such agreement.' "[8]

The evidence clearly established that Sanford and Tibbetts asserted that they were entitled to receive and demanded 1,200 shares of the voting stock. Salisbury denied that they were so entitled and stated that their demand was ridiculous. Even if we assume, although we have decided otherwise, that the inferences which the trial court drew from the conversations between the parties

4. Jacoby v. Shell Oil Co., 7 Cir., 196 F. 2d 855, 858; National Waste Co. v. Spring Packing Corp., 7 Cir., 200 F.2d 14, 16, certiorari denied 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344; 89 C.J.S. Trusts § 158, pp. 1079–1081.

5. Jacoby v. Shell Oil Co., supra; Marshall v. Amos, Okl., 300 P.2d 990; Collins v. Shive, Mo., 261 S.W.2d 58; 89 C.J.S. Trusts § 158, p. 1081. See also, Kitt v. Kitt, 4 Utah 2d 384, 294 P.2d 791, 792.

6. See United States v. Neel, 10 Cir., 235

F.2d 395, 399; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Wilcox Oil & Gas Co. v. Diffie, 10 Cir., 186 F.2d 683, 696.

7. Badger & Co. v. Fidelity Building & Loan Association, 94 Utah 97, 75 P.2d 669, 676.

8. See also, Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 10 Cir., 176 F.2d 73, 76.

were permissible, there can be no doubt that such conversations fully warranted a good faith denial by Salisbury of the claims asserted by Sanford and Tibbetts. The evidence established a bona fide dispute between the parties. Salisbury made an unequivocal offer to settle the dispute by selling to Sanford and Tibbetts 100 shares each of the voting stock at $10 per share. Sanford and Tibbetts unequivocally accepted such offer. The compromise agreement was carried out and thereupon there was an accord and satisfaction.

Sanford and Tibbetts assert that the principles of accord and satisfaction are inapplicable where the relationship of the parties is trustee and beneficiary. They cite no authority in support of that proposition.

We express no opinion as to whether the contention would have validity if an express trust were present. We entertain no doubt that where one party asserts a claim predicated on facts, which, if true, would give rise to a constructive trust and the other party disputes the facts and denies the claim and a bona fide dispute is present, that the parties may enter into a valid and binding accord and satisfaction or compromise agreement.

A constructive trust must never be confused with a real or express trust, which, in itself, contains a fiduciary relationship. The constructive trust lacks the attributes of a true trust [9] and is only a fiction imposed as an equitable device to prevent injustice. It, unlike the express or true trust, is not a fiduciary relationship, although the circumstances which give rise to it may or may not involve a fiduciary relation.[10]

Such being the character of a constructive trust, we perceive no reason why a bona fide dispute with respect to a claim, which, if established, would give rise to a constructive trust, should not be settled and discharged by an agreement of accord and satisfaction.[11]

The judgment is reversed and the cause remanded, with instructions to enter judgment in favor of Salisbury.

9. Healy v. Commissioner of Internal Revenue, 345 U.S. 278, 282–283, 73 S.Ct. 671, 97 L.Ed. 1007; Scott on Trusts, Vol. 3, § 462.1; 89 C.J.S. Trusts § 139 p. 1015.

10. Gendler v. Sibley State Bank, D.C.Iowa, 62 F.Supp. 805; In re Farmers State Bank of Amherst, 67 S.D. 51, 289 N.W. 75, 126 A.L.R. 619; Restatement of the Law of Restitution, § 160, Comment (a); Scott on Trusts, Vol. 3, § 462.1, p. 2316; 89 C.J.S. Trusts § 139 pp. 1018–1019.

11. See Scott on Trusts, Vol. 3, § 481.3.